**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: SOCLEAN, INC., MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION<br><br>This document relates to: *SoClean, Inc.* v. *Koninklijke Philips N.V., et al.*, 2:22-cv-542 | Master Docket: No. 22-mc-152<br>MDL No. 3021 |
| PHILIPS NORTH AMERICA LLC and PHILIPS RS NORTH AMERICA LLC,<br><br>                  Counterclaim-Plaintiffs,<br><br>     v.<br><br>SOCLEAN, INC. and DW MANAGEMENT SERVICES, LLC,<br><br>                  Counterclaim-Defendants. | |

**THE PHILIPS PARTIES' RESPONSE TO DW'S OBJECTIONS TO
<u>SPECIAL MASTER VANASKIE'S REPORT AND RECOMMENDATION</u>**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT .................................................................................................1

FACTUAL RECORD.............................................................................................................3

ARGUMENT ......................................................................................................................5

I.     SPECIAL MASTER VANASKIE SAW THROUGH DW'S WEB OF PAPER
ENTITIES AND FOCUSED ON THE FACTUAL REALITIES. .......................................5

II.    DW SEEKS TO TRANSFORM THIRD CIRCUIT LAW BY DEMANDING
THAT FACTORS APPLICABLE ONLY TO THE PARENT/SUBSIDIARY
CONTEXT GOVERN THE ALTER EGO ANALYSIS HERE. .......................................7

III.   SPECIAL MASTER VANASKIE CORRECTLY CONCLUDED THAT DW
EXERCISED UNDUE CONTROL OVER SOCLEAN. ..................................................11

     A.     DW Attempts to Avoid the Substantial Documentary Record by Relying
Almost Exclusively on the Conflicted and Self-Interested Testimony of
Mark Gavin and Aly Champsi. ............................................................................12

     B.     The Relevant Alter Ego Factors All Point to DW's Undue Control Over
SoClean....................................................................................................................13

          1.     Abuse of Corporate Form, Lack of Corporate Formalities, and
Absence of Corporate Records ............................................................. 13

          2.     Stock Ownership.................................................................................... 16

          3.     Overlapping and Nonfunctioning Officers and Directors........................ 17

          4.     Undercapitalization ................................................................................ 18

          5.     Siphoning ............................................................................................... 21

          6.     Whether SoClean Is Merely a Façade for DW ....................................... 25

CONCLUSION...................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action Mfg. Co.* v. *Simon Wrecking Co.*,
   375 F. Supp. 2d 411 (E.D. Pa. 2005) ............................................................8, 9, 10

*Arch* v. *Am. Tobacco Co.*,
   984 F. Supp. 830 (E.D. Pa. 1997) ....................................................................8

*Brown* v. *Smith*,
   551 F.3d 424 (6th Cir. 2008), *overruled in part on other grounds*, *Cullen* v.
   *Pinholster*, 563 U.S. 170 (2011) ....................................................................10

*Buckley* v. *Universal Sewing Supply*, 2020 WL 7240978 (M.D. Pa. Dec. 9, 2020).....................5

*Compagnie des Grands Hôtels d'Afrique S.A.* v. *Starwood Cap. Grp.*,
   2019 WL 148454 (D. Del. Jan. 9, 2019).............................................................21

*Cortland St. Recovery Corp.* v. *Bonderman*,
   31 N.Y.3d 30 (2018) ............................................................................21, 23

*Eddystone Rail Co.* v. *Bridger Logistics, LLC*,
   2022 WL 1768853 (E.D. Pa. Mar. 21, 2022)..........................................................9

*Gensetix* v. *Bd of Regents*,
   966 F.3d 1316 (Fed. Cir. 2020)......................................................................10

*Hooper* v. *Safety-Kleen Sys.*,
   2016 WL 7212586 (W.D. Pa. Dec. 13, 2016)..........................................................8

*In re Latex Gloves*,
   2001 WL 964105 (E.D. Pa. Aug. 22, 2001) ......................................................8, 10

*Marshall* v. *McCown Deleeuw & Co.*,
   391 F. Supp. 2d 880 (D. Idaho 2005) ................................................................11

*Myco Indus.* v. *Blephex*,
   955 F.3d 1 (Fed. Cir. 2020)........................................................................10

*In re Nat'l Collegiate Student Loan Trusts*,
   971 F.3d 433 (3d Cir. 2020)........................................................................24

*In re Opus E.*,
   528 B.R. 30 (Bankr. D. Del. 2015), *aff'd,* 698 F. App'x 711 (3d Cir. 2017) ...........................7

*RehabCare Grp.* v. *Brighten Health Grp.*,
2007 WL 9813166 (E.D. Pa. Feb. 12, 2007) ..........................................................11

*Seven Springs Mountain Resort, Inc.* v. *Hess*,
2022 WL 1004178 (W.D. Pa. Apr. 4, 2022)...........................................................19

*Simeone* v. *Bombardier-Rotax GmbH*,
360 F. Supp. 2d 665 (E.D. Pa. 2005) ...............................................12, 26, 27, 29

*Sugartown Worldwide* v. *Shanks*,
129 F. Supp. 3d 201 (E.D. Pa. 2015) .....................................................................23

*Superior Coal Co.* v. *Ruhrkohle*,
83 F.R.D. 414 (E.D. Pa. 1979)..........................................................................1, 16

*Tindal* v. *Dist. Att'y*,
2005 WL 745939 (E.D. Pa. Mar. 30, 2005).........................................................12

*Trinity Indus.* v. *Greenlease Holding Co.*,
2014 WL 1766083 (W.D. Pa. May 2, 2014)....................................................22, 23

*UHS of Del., Inc.* v. *United Health Servs.*,
2015 WL 539736 (M.D. Pa. Feb. 10, 2015) ..........................................................28

*United States* v. *Ali*,
508 F.3d 136 (3d Cir. 2007)...................................................................................10

*United States* v. *Pisani*,
646 F.2d 83 (3d Cir. 1981)...............................................................................19, 21

**Other Authorities**

Fed. R. Civ. P. 53(f)(3)-(4) ...........................................................................................5

IRS, *Frequently Asked Questions: Entities*, https://www.irs.gov/faqs/small-
business-self-employed-other-business/entities/entities-5......................................21

Proskauer Memo to Clients, *Veil-Piercing Risks for Private Equity Managers
Highlighted in Recent Court Decision*,
https://www.privateequitylitigation.com/2019/09/veil-piercing-in-private-
equity-risks-for-funds-and-managers...................................................................11

## PRELIMINARY STATEMENT

Special Master Vanaskie's Report and Recommendation ("R&R") highlighted a vast array of record facts proving DW's pervasive control over SoClean. These facts ranged from big-ticket items, such as the voting and veto rights enjoyed by DW—and DW alone—and DW's intimate involvement in developing, managing, and approving SoClean's budgets (R&R at 11, 14-15), down to micro, day-to-day SoClean issues, such as inventory management at SoClean's warehouses and bonuses for SoClean management (*id.* at 16-19). Special Master Vanaskie documented DW's control over the key decisions and relationships affecting SoClean, such as SoClean's sales strategy, the relationship between SoClean and SoClean's primary lender, and decision-making regarding when to distribute dividends, in what amount, and to whom. (*Id.* at 14-16, 45-51.) Special Master Vanaskie also properly accounted for SoClean's undercapitalization at the time of the leveraged buyout, DW's subsequent siphoning of funds, and the many instances in which DW and SoClean disregarded corporate formalities, which allowed DW to make "decisions that nullified some of the SoClean officers and directors' decisions." (*Id.* at 30-33, 38-42.)

DW says none of this matters, pretending some private equity exception to the alter ego doctrine exists. DW seeks to create an absolute alter ego immunity by proposing a framework that would require courts to blindly march through a checklist of factors without consideration of their underlying rationales or relevance to the particular circumstances. DW's reformulation prefers superficial tests over factual substance, all to mask its control over SoClean. This proposed framework not only undermines the role and judgment of courts but also is contrary to at least 40 years of alter ego jurisprudence. *See, e.g.*, *Superior Coal Co.* v. *Ruhrkohle*, 83 F.R.D. 414, 421 (E.D. Pa. 1979) ("The substance, not form, of the inter-corporate nexus will be dispositive.").

To avoid the record, DW frames its objections principally as a dispute concerning whether the Court should apply the factors cited in the Third Circuit's *Lutyk* decision or those cited

by this Court in *Enterprise*. But DW's "*Lutyk* versus *Enterprise*" rhetorical device misses the point, because the alter ego inquiry has never been wedded to the rigid application of a particular list of factors. The alter ego analysis fundamentally centers on the "degree of control." *Enterprise*, 735 F. Supp. 2d 277, 318 (W.D. Pa. 2010), *aff'd*, 683 F.3d 462 (3d Cir. 2012). Accordingly, "[c]ourts have applied a variety of tests" to assess the degree of control. *Id.* Why? Because "the issue may best be dealt with using a flexible, case-by-case standpoint." *Id.*

Special Master Vanaskie undertook precisely the legally required "fact-intensive" alter ego inquiry, explaining that it "is not a checklist" but instead "evaluate[s] whether, taken together, the facts as alleged demonstrate a relationship . . . that exceeds normal control between the related entities and whether they have disregarded traditional corporate boundaries." (R&R at 27.) DW's contention—that courts must strictly apply the factors set forth in *Enterprise*, which concerned a parent/subsidiary relationship instead of a private equity/portfolio company relationship—not only invites error, but also effectively provides an absolute shield over business relationships that do not precisely match the *Enterprise* fact pattern. But as Special Master Vanaskie properly found, not all business relationships would involve, for example, "unified marketing" or "crossover in the corporate insignias, trademarks and logos." (R&R at 29.) The purpose of the alter ego doctrine is to identify all indicia of control, not only those ordinarily present in the parent/subsidiary context.

Tellingly, DW largely avoids the *documentary* record. Instead, DW relies almost exclusively on the testimony of its two witnesses, especially SoClean's CFO, Mark Gavin. But as part of his evaluation, Special Master Vanaskie properly determined that Mr. Gavin—whose direct financial interest in the outcome of this litigation DW negotiated—provided testimony that was not credible. DW never even attempts to rebut that finding. Consequently, implicit in DW's brief

-2-

is a request that the Court credit Mr. Gavin while ignoring the unambiguous contemporaneous business documents handing control to DW and showing DW putting that control into effect.

Contrary to DW's manufactured hysteria, the R&R does not pose any "danger" to the "business community" writ large.  (Br. at 3.)  Special Master Vanaskie's analysis carefully focused on the specific facts of *this* case, concluding that the record evidence demonstrates an alter ego relationship between the *only* entities at issue in this case (DW and SoClean), not *every* private equity firm and their portfolio companies.  Despite having had ample opportunity to do so, DW never submitted any evidence showing what a "run-of-the-mill private equity investment relationship[]" actually is (*id.* at 1) or that all private equity firms take "control or near control investment positions" in their portfolio companies, as DW concededly did here (JX002.020).  The relevant question in this case is whether, on *these* particular facts, SoClean was DW's alter-ego—not whether the hypothetical relationships between other unnamed private equity firms and their portfolio companies raise or do not raise alter ego concerns based on their particular facts.

Simply put, Special Master Vanaskie's R&R shows how DW "gut[ted]" SoClean, leaving it a heavily leveraged "shell" (JX106.002) with, at best, limited assets available to satisfy a damages award.  Of course, DW hopes to keep all of the money it siphoned from SoClean, while directing SoClean—which is not selling any devices, despite FDA approval of the SoClean 3+ last year—to pursue its claims against the Philips parties through third-party litigation funding from DW's preferred lender and management bonuses that support the litigation.  DW never treated SoClean as a separate entity, and it should now bear the consequences of that conduct.

## FACTUAL RECORD

The Philips parties' Proposed Findings of Fact ("PFF") provides a complete summary of the factual record, consisting of 314 jointly submitted documents, three witnesses, and two days of evidentiary hearing.  (ECF No. 861, ¶¶ 1-182.)  Briefly here, in December 2017,

DW acquired SoClean and added it to its stable of portfolio companies through a leveraged buyout transaction for an aggregated purchase price of $121 million. (*Id*. ¶ 20.) Prior to the DW-led buyout, SoClean was a growing business: sales of its flagship product had begun to grow, and its marketing, operations, and debt were manageable. (*Id.* ¶¶ 16-18.) To effectuate the buyout, DW established several new SoClean entities, with an undercapitalized limited partnership entity (along with its similarly undercapitalized general partner entity) at the top of the organizational structure and SoClean, Inc., the sole operating entity, at the bottom. (*Id.* ¶¶ 27-32.) SoClean borrowed $55 million from one of DW's long-time business partners (White Oak) to fund DW's acquisition of approximately 85% of the A1 "Preferred Units" at the top of the SoClean corporate structure. (*Id.* ¶¶ 22-23.) At the same time, DW conditioned the acquisition upon SoClean's approval of an "Advisory Agreement" that made DW SoClean's "financial and management consultant" for an annual $1 million fee. (*Id.* ¶¶ 53-55; JX244.001.)

The structure granted DW extraordinary authority over SoClean's business. By design, DW held the majority of votes on the boards of each of the SoClean entities it created, and those entities' governing documents also granted DW—through the DW Funds it controlled—a wide variety of negative control rights. (PFF ¶¶ 43, 46, 48-50.) Together, these powers restricted SoClean's ability to act without DW's consent. The Advisory Agreement separately gave DW the power to direct and manage SoClean's business in its sole discretion. (*Id.* ¶¶ 53-55.) In addition, the preferred unitholders, of which DW made up 85%, received preferred returns and payments on dividends, to the exclusion of the previous owners of SoClean. (*Id.* ¶¶ 23, 34-37.)

Even with the benefit of the "presumption of corporate separateness" (R&R at 24), Special Master Vanaskie found that DW never treated SoClean like a separate corporate entity. For one thing, DW and SoClean did not bother to maintain basic corporate formalities. Instead,

DW repeatedly designated itself to take actions on SoClean's behalf, used SoClean's funds for its own purposes, and never held shareholder meetings at any level of the SoClean corporate structure. (*Id.* ¶¶ 56-73.)  DW regularly interposed itself into SoClean's business and controlled key SoClean business decisions (*id.* ¶¶ 145-82), including by designing SoClean's borrowing of $40 million—on top of the $55 million DW caused SoClean to borrow to fund the buyout—to fully repay (with interest) the investments of the DW Funds and the other preferred unitholders (*id.* ¶¶ 22, 80-82, 93-94, 97-114).  Even worse, DW made the decisions regarding this additional borrowing prior to any discussions with SoClean's Board or management.  (*Id.* ¶¶ 97-114.)  Within less than a year, DW's aggressive financial decisions left SoClean in a precarious financial situation, first with a host of defaults on its primary loan agreement, which ultimately led to SoClean's conceded insolvency.  (*Id.* ¶¶ 131-139, 220.)

## ARGUMENT

A report and recommendation is reviewed *de novo*.  Fed. R. Civ. P. 53(f)(3)-(4). The burden of proof is by a preponderance, which requires a showing that SoClean is "more likely than not" DW's alter ego.  *Buckley* v. *Universal Sewing Supply*, 2020 WL 7240978 at *2-5 (M.D. Pa. Dec. 9, 2020).

## I. SPECIAL MASTER VANASKIE SAW THROUGH DW'S WEB OF PAPER ENTITIES AND FOCUSED ON THE FACTUAL REALITIES.

DW incorrectly argues that Special Master Vanaskie relied on a "collective alter ego" theory that "aggregat[ed] the activities of various [DW] entities to create a single, direct chain of control between" SoClean and DW.  (Br. at 13, 19.)  DW offers no support for this assertion.[1]

---

[1]    Despite repeatedly accusing Special Master Vanaskie of making "many errors," DW only ever points to one:  the definition of LifeBrands Holdings, Inc. as DW in a footnote.  (Br. at 5 n.3, 14.)  Based only on that footnote, DW argues that Special Master Vanaskie must have been analyzing the relationship between SoClean and LifeBrand Holdings, rather than between SoClean

Moreover, this argument disregards the factual realities of the relationship between DW and SoClean. Special Master Vanaskie, however, did see the forest for the trees, appropriately concluding that DW's creation of separate entities on paper did not mean that those nominally different entities *functioned* separately. In fact, Special Master Vanaskie made accurate factual determinations regarding each DW and SoClean entity's role within the structure (s*ee* R&R at 6-7), which supported his ultimate conclusion regarding control. (*See* R&R at 8; JX205.009.)

At bottom, DW asks the Court to ignore the reality of the DW enterprise—namely, that the *sole* operating entity, and *the only DW entity with any employees*, is DW Management (R&R at 6)—so as to make it impossible to pin alter ego responsibility on *any* DW entity. Although DW Management does not itself own shares of SoClean, DW Managing Director Aly Champsi, who was "the lead on the SoClean investment" (DW PFF ¶ 23), acknowledged that DW Management invests through its affiliated DW Funds. (Nov. 13, 2024 Evid. Hr'g Tr. at 94:20-95:8.) As Mr. Champsi explained, a DW portfolio company, such as SoClean, is "a company which *we* have invested in either a majority or minority stake" after "*we* raise these third party funds." (*Id*. (emphasis added).) In regulatory filings, DW describes its funds' investments as "control or near-control investment positions." (JX002.020.) The DW funds do *not* have any employees, and thus only act through "employees of DW Management [who] are responsible for [the funds'] investment decisions." (Nov. 13, 2024 Hearing Tr. at 123:14-24.) Consequently, as Mr. Champsi conceded, when the DW Funds take a stake in a portfolio company, "DW puts its

---

and DW. (*Id*. at 5 n.3.) But nowhere in his 52 pages of analysis does he discuss DW in a way that appears to confuse DW for a shell holding company (LifeBrand Holdings f/k/a SoClean Holdings) rather than a private equity firm, and the multiple other references in the R&R to the holding company are accurate. (*E.g.*, R&R at 13-14.)

own people or people of its choosing" in positions to carry out the powers granted to the funds. (*Id.* at 125:24-126:2.)  And "that happened here for SoClean too."  (*Id.* at 126:3-4.)

Every DW entity ultimately traces back to the same group of DW personnel.  (PFF ¶¶ 8-13.)  And each SoClean entity also had that same group of DW personnel as its officers and directors.  (*Id.* ¶¶ 74-79.)  Even before the buyout and the Advisory Agreement, those DW personnel signed documents on behalf of the SoClean entities they created.  (R&R at 13.) Although DW claims that "when individuals like Mr. Champsi signed documents on SoClean's behalf, he was doing so as an officer of the company, not as a representative of any DWHP entity" (Br. at  7), DW offers no evidentiary support for that claim, and it only underscores the blurred lines between DW and SoClean in any event.

Just as DW demands rigid adherence to a list of factors to the exclusion of others (*see* Section II *infra*), DW insists the Court elevate form over substance by ignoring the reality of how DW managed SoClean.  This Court is not required to blindly accept that DW's hodgepodge of entities are all separate, irrespective of how the entities—all run by the same employees of DW—actually function in practice.  *See In re Opus E.*, 528 B.R. 30, 57 (Bankr. D. Del. 2015) ("The purpose of allowing the corporate veil to be pierced on an alter ego theory is to hold the party actually responsible for the inequitable conduct accountable and to prevent that party from using another corporation to shield itself from liability."), *aff'd,* 698 F. App'x 711 (3d Cir. 2017).

## II. DW SEEKS TO TRANSFORM THIRD CIRCUIT LAW BY DEMANDING THAT FACTORS APPLICABLE ONLY TO THE PARENT/SUBSIDIARY CONTEXT GOVERN THE ALTER EGO ANALYSIS HERE.

Central to DW's flawed argument is the incorrect assertion that Special Master Vanaskie "abandon[ed]" *Enterprise* in his R&R.  (Br. at 15.)  In fact, it is DW that has abandoned *Enterprise*'s core tenet—a flexible, fact-specific approach to the alter ego inquiry—by demanding "exclusive" adherence to a particular set of ten factors and pressing blind reliance on factors that

have no relevance to the particular business structure at issue. Control, not a stagnant set of inflexible factors, is at the heart of the alter ego inquiry.

As the Philips parties have said since the beginning (*e.g.,* ECF No. 546 at 13), the alter ego inquiry is about the "degree of control." *In re Latex Gloves*, 2001 WL 964105, at *3 (E.D. Pa. Aug. 22, 2001). Recognizing that overarching principle, this Court in *Enterprise* explained that the control inquiry is best "dealt with [on] a flexible, case-by-case standpoint" that accounts for the particular circumstances at issue. 735 F. Supp. 2d at 318; *see Hooper* v. *Safety-Kleen Sys.*, 2016 WL 7212586, at *6 (W.D. Pa. Dec. 13, 2016) (discussing "[o]ther ways to frame the [alter ego] inquiry"). Courts may "examine any factor that is relevant to the jurisdictional inquiry before it, and what factors the court will examine depends on the particular circumstances of the case before it." *Arch* v. *Am. Tobacco Co.*, 984 F. Supp. 830, 837 n.7 (E.D. Pa. 1997).

*Enterprise* concerned a parent/subsidiary relationship in the context of a family of franchises operating under the brand "Enterprise Rent-A-Car." 735 F. Supp. 2d at 317. The Court reviewed ten "non-exclusive" factors to help evaluate the parent's degree of control. *Id.* at 318-19. As in several parent-subsidiary relationships, the parent was the subsidiary's sole shareholder, used a uniform marketing image with its subsidiary, and shared an "integrated sales system" and other services with the parent's IT and HR departments. *Id.* at 323. The Court found that many of the factors relevant to a parent-subsidiary alter ego relationship were present, but ultimately found only "the kind of control associated with parent-subsidiary relationships." *Id.* at 324.

The ten factors listed in *Enterprise* are not the exclusive factors that bear upon *every* form of relationship, as the "alter-ego theory of imputing jurisdictional contacts 'perforce incorporates all the factors that have been historically used in determining'" alter ego liability. *Action Mfg. Co.* v. *Simon Wrecking Co.*, 375 F. Supp. 2d 411, 422 (E.D. Pa. 2005). In fact, in

-8-

*Action Manufacturing*, the court expressly noted that the factors in *Lutyk* were relevant to the alter

ego jurisdictional inquiry. *Id.* at 421-22. In *Lutyk*, an alter ego liability case involving a company

and its sole shareholder, the Third Circuit identified the following factors:

> gross undercapitalization, failure to observe corporate formalities,
> nonpayment of dividends, insolvency of debtor corporation, siphoning of
> funds from the debtor corporation by the dominant stockholder,
> nonfunctioning of officers and directors, absence of corporate records, and
> whether the corporation is merely a facade for the operations of the
> dominant stockholder.

*Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003). But these factors, just like those in *Enterprise*, do not

displace the ultimate control inquiry; instead, they anchor the analysis in factors that are relevant

to the particular relationship at issue.[2]

Special Master Vanaskie got this all correct, recognizing that (contrary to DW's

argument) "*all* relevant evidence can be assessed to determine the parties' relationship for the

purposes of alter ego personal jurisdiction." (R&R at 29.) To aid his analysis—but not to replace

the primary control inquiry—Special Master Vanaskie considered factors relevant to the

relationship between DW and SoClean.[3] As Special Master Vanaskie noted, "[a] number of the

---

[2] Even if the factors were determinative, "[s]trong evidence supporting just one or two factors can establish [an] alter ego" relationship. *Eddystone Rail Co.* v. *Bridger Logistics, LLC*, 2022 WL 1768853, at *2 (E.D. Pa. Mar. 21, 2022).

[3] DW overstates the import of the court's discussion of *Enterprise* in *Fuhrman* v. *Mawyer*. *See* 2023 WL 5672314, at *7-8 (M.D. Pa. Sept. 1, 2023). There, the court cited *Enterprise* for the proposition that a plaintiff "must prove that the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent." *Id.* at *7. Contrary to DW's suggestion, the court did *not* strictly apply each and every *Enterprise* factor to the relationship in that case, which was between a private equity manager and a portfolio company. *See id.* Instead, the court walked through plaintiff's "bare allegations," noting that defendant's declaration sharply refuted any possibility of an alter ego relationship given the lack of common employees, absence of involvement in the portfolio's company's day-to-day activities, and general absence of evidence of the private equity firm's decision-making. *Id.* at *8. In short, unlike in this case, there was little evidence that the private equity sponsor had undue control.

factors enumerated in *Enterprise* simply do not apply in the context of this case," given the relationship between DW and SoClean as private equity manager and portfolio company rather than as parent and subsidiary. (*Id.*) Rather, "the factors provided in *Lutyk*, while not perfect, offer a more applicable set of factors to assess the significance of DW's exercise of control over SoClean." (*Id.*)[4] The Philips parties did not somehow "waive" the ability to cite the *Lutyk* factors because they previously also discussed the *Enterprise* factors. (Br. at 15.)[5] Any of the factors, whether from *Lutyk*, *Enterprise*, or any of the other "factors that have been historically used" in the analysis, *Action Mfg.*, 375 F. Supp. 2d at 422, may be considered if they bear on the overall question of undue control. *See Lutyk*, 332 F.3d at 194 (factors articulated by courts in previous alter ego cases have "never [been] characterized . . . as elements of a rigid test").

DW contends that the absence of evidence on several of the *Enterprise* factors "is not evidence that the test itself is flawed," but instead shows that "indicia of an alter ego relationship *are not present*" in this case. (Br. at 15.) But looking only to the "indicia of an alter ego relationship" present in *Enterprise* is a misstatement of the law that would eliminate the possibility of an alter ego relationship in any type of business relationship other than the parent-

---

[4]     DW asserts that Special Master Vanaskie's reference to the *Lutyk* factors is "legally specious" because he purportedly "leverages *Poe* v. *Babcock*" to "justify [the] abandonment of this Court's long-standing test for alter ego personal jurisdiction." (Br. at 16.) DW again puts form over substance by construing *Poe* as a mandatory test that draws a sharp "distinction" between two different categories of corporate relationships. (*Id.*) But *Poe*—like many cases addressing alter ego relationships—merely re-articulates that although a certain degree of control is inherent in any parent-subsidiary relationship, 662 F. Supp. 4, 6 (M.D. Pa. 1985), the alter ego question focuses on the degree of control (R&R at 25 (citing *In re Latex Gloves Prods. Liab. Litig.*, 2001 WL 964101, at *3)). Special Master Vanaskie properly rejected DW's arbitrary distinction. (*See* R&R at 28-29.)

[5]     Further, it is long-established blackletter law that "there can be no waiver . . . of the Judge's duty to apply the correct legal standard." *United States* v. *Ali*, 508 F.3d 136, 144 n.9 (3d Cir. 2007); *accord Brown* v. *Smith*, 551 F.3d 424, 428 n.2 (6th Cir. 2008), *overruled in part on other grounds*, *Cullen* v. *Pinholster*, 563 U.S. 170 (2011); *Gensetix* v. *Bd of Regents*, 966 F.3d 1316, 1325 n.8 (Fed. Cir. 2020); *Myco Indus.* v. *Blephex*, 955 F.3d 1, 11 n.4 (Fed. Cir. 2020).

subsidiary one. *See* 735 F. Supp. 2d at 318 ("[T]he issue may best be dealt with using a flexible, case-by-case standpoint.").[6]  As Special Master Vanaskie explained, "[a] number of the factors enumerated in *Enterprise* simply do not apply in the context of this case . . . [b]ecause SoClean is not a subsidiary of DW, but is a company within DW's investment portfolio."  (R&R at 29.)  For instance, a private equity firm would not share a "unified marketing image" or "corporate insignias, trademarks, and logos" with its portfolio company, or use its portfolio company as its "exclusive distributor."  (*Id.*)  A private equity firm, by its very nature, has multiple portfolio companies and does not "distribut[e]" a physical product.  *See Enterprise*, 735 F. Supp. 2d at 318.  The absence of these factors—in the context of a private equity firm/portfolio company relationship—says nothing about whether the private equity firm exerted undue control over its portfolio company.

## III.    SPECIAL MASTER VANASKIE CORRECTLY CONCLUDED THAT DW EXERCISED UNDUE CONTROL OVER SOCLEAN.

After mining the extensive record and considering "*all* relevant evidence" (R&R at 29), Special Master Vanaskie found that "DW exercised substantial control over SoClean's financial decisions and provided SoClean with minimal autonomy" (*id.* at 51).  This "control coupled with a corporate structure that provided significant veto power to DW and a lack of clear

---

[6]      Courts have applied the alter ego inquiry to a number of different types of relationships. *See, e.g.*, *Lutyk*, 332 F.3d at 190 (sole shareholder); *RehabCare Grp.* v. *Brighten Health Grp.*, 2007 WL 9813166, at *2 n.4 (E.D. Pa. Feb. 12, 2007) (LLC members); *Marshall* v. *McCown Deleeuw & Co.*, 391 F. Supp. 2d 880, 881 (D. Idaho 2005) (private equity firm/portfolio company). In fact, even DW's counsel itself has acknowledged that private equity firms can be held liable as the alter egos of their portfolio companies.  DW's counsel correctly recognized that "[w]hile courts may go about assessing veil piercing claims differently, at its core the doctrine is about fairness and holding accountable those *in control of an entity's actions*."  Proskauer Memo to Clients, *Veil-Piercing Risks for Private Equity Managers Highlighted in Recent Court Decision*, https://www.privateequitylitigation.com/2019/09/veil-piercing-in-private-equity-risks-for-funds-and-managers (emphasis added).

distinguishment between the SoClean entities demonstrates that SoClean operated more as a façade for DW than its own company." (*Id.* at 51-52.)

A. **DW Attempts to Avoid the Substantial Documentary Record by Relying Almost Exclusively on the Conflicted and Self-Interested Testimony of Mark Gavin and Aly Champsi.**

Notably, DW's objections and its Proposed Findings of Fact and Conclusions of Law are bereft of references to *documentary* "record evidence." Instead, DW relies almost exclusively on Mr. Gavin's and Mr. Champsi's self-serving testimony as the purported "record evidence" that DW did not control SoClean. (*See, e.g.*, Br. at 7-8, 20, 24, 26, 28.) Their testimony was entirely conclusory. For instance, DW cites Mr. Gavin's conclusory testimony that DW was not involved in the "day-to-day operations" of SoClean and that only SoClean's CEO controlled SoClean's decision-making. (*E.g.*, *id.* at 20.) But such "bald assertion[s]" are "not enough to refute" facts, especially contemporaneous documentary facts. *Simeone* v. *Bombardier-Rotax GmbH*, 360 F. Supp. 2d 665, 678 (E.D. Pa. 2005). As the Eastern District of Pennsylvania has explained, a "bald assertion that [the alleged alter ego] is not involved with [the allegedly controlled entity] on a day-to-day basis is not enough to refute Plaintiffs' lengthy accounting of the ways in which [the alter ego] dominated [the controlled entity]." *Id*.

By contrast, Special Master Vanaskie considered "*all* relevant evidence." (R&R at 29.) In doing so, Special Master Vanaskie found that Mr. Gavin's testimony was not credible for "several reasons," including that (i) "the documentary record" rebutted his testimony, and (ii) "Mr. Gavin has a substantial personal financial interest in the outcome of this litigation, and it is not in his interest to have DW found to be the alter ego of SoClean." (*Id.* at 20; *see also* PFF at 29 n.8 (describing Mr. Gavin's $2.5 million contingency agreement); *Tindal* v. *Dist. Att'y*, 2005 WL 745939, at *4 (E.D. Pa. Mar. 30, 2005) ("It is well-established that the evaluation of a witness's credibility is for the fact finder, who may believe all, part, or none of the witness's testimony.").)

As the factfinder, Special Master Vanaskie was well within his discretion to find that Mr. Gavin's testimony was not credible, especially in light of Mr. Gavin's evasiveness on the stand,[7] and the repeated inconsistencies between his testimony and the documentary record.

**B.    The Relevant Alter Ego Factors All Point to DW's Undue Control Over SoClean.**

Special Master Vanaskie appropriately assessed all of the relevant evidence and determined that DW controlled SoClean beyond what is "normally associated with common ownership and directorship."  (R&R at 24.)

**1.    Abuse of Corporate Form, Lack of Corporate Formalities, and Absence of Corporate Records**

DW objects to Special Master Vanaskie's "mixed" conclusions regarding these factors because, according to DW, he purportedly "faults the SoClean entities for failing to list all SoClean entities on the meticulously kept SoClean Parent Board minutes" and "focuses on the wrong relationships . . . between various SoClean entities," rather than between DW and SoClean. (Br. at 28-29.)  That objection hardly responds to the massive evidence in the record of SoClean's and DW's disregard of the corporate form.

Other than SoClean Parent, no SoClean entity—including the SoClean, Inc. operating entity—ever held a board meeting.  (PFF ¶ 44.)  SoClean attempts to rewrite SoClean Parent's board minutes by claiming that the board meetings were "consolidated" (SoClean 30(b)(6) Tr. at 66:13-18; 66:20-22), but the minutes themselves belie that notion, as they are

---

[7]    *E.g.*, Dec. 2, 2024 Evid. Hr'g Tr. at 48:22-25 ("Q. At the time that you were considering a $31.5 million distribution, the entire net income to date was either 3.4 million or 5.097 million, right?  A. The number is irrelevant.); *id.* at 50:24-51:2 ("Q. You didn't answer my question.  Whose responsibility is it to ensure SoClean Holdings is adequately capitalized to meet its guarantor obligations?  A. The question is irrelevant."); *id.* at 67:24-68:1 ("Q. There was no board meeting before Mr. Moore was doing that, was there?  A. The consent resolution was May 14, 2018.").

labeled the "*SoClean Parent, LP* Minutes of a Meeting of the Board of Managers" and nowhere purport to record a meeting of any other SoClean entity's board (*see* PFF ¶¶ 45-46; *e.g.*, JX162.001, JX271.001.)  In fact, if these "consolidated" board meetings actually existed and were reflected in the minutes, then David Beatty and Eric Moore were *de facto* members of the boards of the other SoClean entities and made decisions on behalf of those other entities even though they only served on the boards of some, but not all, of the SoClean entities.  (PFF ¶¶ 46.)  DW's attempt to rebut its abuse of the corporate form, if credited, only further amplifies the abuse.

The disregard of the corporate form is further illustrated by other facts in the record, including that SoClean, Inc. paid for all of the other SoClean entities' expenses—including hundreds of thousands of dollars in auditor fees for the SoClean Parent annual consolidated financials, and hotels, airfares, lunches, and dinners for SoClean Parent board members when traveling to DW's preferred venues for meetings.  DW does not challenge that this intermingling occurred, and even worse, no intercompany agreements between the various SoClean entities ever existed.  (*Id.* ¶¶ 65-66, 69, 258.)  Further, the supposed Compensation and Audit Committees never prepared any reports (*id.* ¶¶ 260-61), and no SoClean entity ever held a shareholder meeting, in violation of their bylaws and state law (*id.* ¶¶ 70-73, 236-38).

DW oddly faults Special Master Vanaskie even for considering the total lack of corporate formalities between the various SoClean entities.  (Br. at 28-29.)  But, of course, the fact that SoClean entities established and overseen by DW lacked corporate formalities is squarely relevant to the alter ego inquiry.  *Lutyk*, 332 F.3d at 194.  Moreover, Special Master Vanaskie *also* found a lack of corporate boundaries *between DW and SoClean*.  For example, "[f]rom before the buyout and throughout the DW-SoClean relationship, DW personnel consistently signed documents on behalf of SoClean entities" (R&R at 13), including signing the Stock Purchase

-14-

Agreement effectuating the buyout on behalf of SoClean Buyer (PFF ¶ 246); signing the SoClean Parent LP Agreement on behalf of SoClean Parent and SoClean Parent GP (*id.*); signing as the "Authorized Officer" in the Certificate and Articles of Merger that created the "new" SoClean entity (*id.* ¶ 247); identifying a DW entity (and DW's mailing address) as SoClean's representative in an agreement between SoClean and another manufacturer of PAP cleaning devices (JX207.011); and listing DW's address as the address of "the Partnership" for SoClean Parent (JX252.044). In fact, the general partner of SoClean Parent (also created by DW) had DW as its sole member and only DW employees as officers. (PFF ¶¶ 273, 293.) DW even negotiated amendments to SoClean's loans from White Oak and Silicon Valley Bank—without the involvement of any SoClean personnel—despite not being a party to either loan agreement. (*Id.* ¶¶ 250-57.)

Ample other evidence supported Special Master Vanaskie's conclusion, including that Section 3.9 of the Limited Partnership Agreement—which granted DW copious negative control rights over *all* SoClean entities—stripped power from the SoClean entities' boards to the point where the control "limitations infringed upon the SoClean Parent LP's Board of Managers' powers *as enumerated in its own bylaws*." (R&R at 36 (emphasis added); PFF ¶¶ 241-44; JX241.021.) DW does not deny that these provisions are evidence of control, but rather tries to brush them off as mere "paper rights," whatever that may mean, which somehow carry less weight than the rights typically associated with majority ownership. (Br. at 18-20.) Setting aside the fact that ownership rights exist on "paper" just as partnership rights do, DW did also exercise its negative control rights. For example, DW's control over SoClean's annual budget (*infra* Sections III.B.2 & III.B.6) is rooted in Section 3.9 of the LP Agreement, which prohibited all SoClean entities from "consummat[ing] any . . . capital expenditure (or series thereof) . . . in excess of $500,000" without approval from DW. (PFF ¶¶ 146-52; JX227.001.) DW also exercised its

control over SoClean equity incentive and severance plans (JX033.001, JX050.001) and brought

on new SoClean officers (*see* PFF ¶¶ 176, 280) pursuant to subsections (g) and (j) of Section 3.9.

Special Master Vanaskie properly weighed these considerations.  (R&R at 44-45.)

### 2.      Stock Ownership

As to majority stock ownership, Special Master Vanaskie correctly concluded that

DW's exceptional veto rights under Section 3.3 of the LP Agreement—a power granted only to

DW, not any of the other A1 preferred unitholders—rendered relative ownership less relevant.

(*See* R&R at 10-11.)  Section 3.3 of the LP Agreement requires the affirmative approval of "the

Majority DW Holders" for "all actions, consent and approvals."  (PFF ¶ 271.)  DW claims that

these veto rights are a "far cry from having an actual majority of shares" (Br. at 18), but fails to

acknowledge that *every* unitholder vote required DW's express approval, which sidesteps the

traditional "one share, one vote" principle.  (PFF ¶ 271.)  Under these circumstances, DW had the

*very same rights* (if not more) than it would have had if it was, in fact, the majority shareholder of

SoClean.  *See Superior Coal Co.*, 83 F.R.D. at 421 (formal "ownership of less than half of the

stock is no talisman; control sufficient for jurisdictional purposes may be present even where there

is no stock ownership").

Special Master Vanaskie also properly recognized that DW's argument that "no

DWHP entity has ever owned *any* shares in SoClean, Inc." does not move the needle because the

DW funds hold a direct financial interest in SoClean, and the DW funds act through the employees

of DW.  (Br. at 17; R&R at 6-7.)  By virtue of this structure, when DW's *funds* take "control or

near-control investment positions," that control is effectuated through *DW and its employees.*

(JX002.020; Nov. 13, 2024 Evid. Hr'g Tr. at 124:19-25, 125:16-25, 126:1-3, 141:7-24.)

### 3.    Overlapping and Nonfunctioning Officers and Directors

DW concedes that DW and SoClean share officers and directors.  (*See* Br. at 18 ("employees of DWHP held Board and officer positions at SoClean").)  Rather than challenging that finding, DW asserts that Special Master Vanaskie erred with respect to the *relevance* of the overlap because, according to DW, the evidence does not show that DW "nullified a SoClean decision."  (*Id.* at 29.)  In other words, DW posits this factor should not matter because there is no evidence that DW's presence impeded SoClean's officers and directors.

But after reviewing the documentary record (instead of only Messrs. Gavin and Champsi's interested testimony), Special Master Vanaskie found that although "SoClean's officers and directors did undertake their duties, . . . DW made decisions that nullified some of SoClean officers and directors' decisions."  (R&R at 42-43.)[8]  Specifically, Special Master Vanaskie correctly observed that DW—not SoClean—was the actual driver of key decisions concerning SoClean's 2018 distributions to DW's funds, as well as SoClean's budget and executive compensation.  (*See id.*)  With respect to the distributions, the documentary record severely undermines Mr. Gavin's testimony asserting that he led the decision-making.  (Dec. 2, 2024 Hr'g Tr. at 51:6-9.)  As the record showed, DW led the charge entirely (*see* PFF ¶¶ 92-114), working out the amount and mechanics of the distribution with White Oak "unbeknownst to Mr. Gavin" (R&R at 42.)  Although Mr. Gavin may have later assisted by preparing a spreadsheet for the file to "substantiate [SoClean's] ability to do the dividend" at a "board discussion" (Nov. 13, 2024 Hr'g Tr. at 220:20-222:13; *see also* JX284A), all decisions regarding the distribution, including

---

[8]    Through the "DW representatives," DW has always held the majority of votes on the board of every SoClean entity.  (JX241.110.)

*the decision to make the distribution and the amount of the distribution*, were made *before* the Board's review of Mr. Gavin's spreadsheet.  (*See* PFF ¶¶ 97-108.)

The record also demonstrates that DW—not SoClean's management—controlled SoClean's spend through its control of the SoClean budget process.  Contrary to Mr. Gavin's testimony, no record evidence indicates that the board of *any* SoClean entity *ever* approved any of SoClean's budgets.  Instead, the evidence unambiguously demonstrates that the full DW partnership approved and oversaw SoClean's budgets.  (*See* PFF ¶¶ 146-52; JX144.001.)  And, as Special Master Vanaskie observed, DW similarly "controlled decisions on compensation of SoClean executives" without "consult[ing] any member of [SoClean's] Compensation Committee."  (R&R at 16, 42.)  In fact, there is no record that the SoClean Compensation Committee *ever* even held a single meeting.  (DW 30(b)(6) Tr. at 152:20-154:28.)  Compensation decisions were simply made by Mr. Champsi alone.  (*See* JX209.002; JX136.001; JX086.001.)

### 4.    Undercapitalization

DW disputes Special Master Vanaskie's findings as to SoClean's undercapitalization (R&R at 30-33) because (1) Special Master Vanaskie did not consider SoClean's capitalization at the time of its incorporation in 2011 (Br. at 23, 24 n.9); (2) there is no "evidence establishing the ordinary capital needs of a company of SoClean's size and within its industry as required to make an undercapitalization showing" (*id.* at 23); and (3) even if the relevant inquiry looked to the time of the buyout in 2017, SoClean was adequately capitalized then (*id*. at 23-24).  DW is wrong on all accounts.

*First*, as Special Master Vanaskie correctly observed, the relevant inquiry looks to the time of the leveraged buyout of SoClean in 2017.  (R&R at 32.)  Focusing on the initial incorporation of SoClean's predecessor, Inceptus, Inc., six years before DW's leveraged buyout and establishment of a new SoClean corporate structure, would result in a "formalistic analysis

-18-

[that] ignores reality," as "[t]he 2017 entity had different ownership and, more importantly, different capital needs." (*Id.*)[9]  Although SoClean existed prior to the 2017 buyout, the entity referred to today as "SoClean, Inc." was created in December 2017 as a result of the merger of SoClean Buyer, Inc. with the prior "SoClean" entity. (JX239.002; JX240.001; PFF ¶ 202.)

    *Second*, although the Philips parties' expert[10] never opined (nor did he need to) on the exact "level of capital" needed for a "company of SoClean's size and within its industry" (Br. at 23), Dr. Denis testified that SoClean was "increasingly overleveraged and undercapitalized through time," and ultimately became insolvent. (R&R at 33 (citing Nov. 13, 2024 Evid. Hr'g Tr. at 56-57); PFF ¶¶ 222-31.)  Contrary to DW's argument (Br. at 23), proving an exact "level of capital" is not necessary.  *See United States* v. *Pisani*, 646 F.2d 83, 88 (3d Cir. 1981) (finding undercapitalization without proof of exact level of capital needed); *Seven Springs Mountain Resort, Inc.* v. *Hess*, 2022 WL 1004178, at \*7 (W.D. Pa. Apr. 4, 2022) (same).  And as is the case here (PFF ¶¶ 218-20), *Lutyk* makes clear that an entity's subsequent insolvency can be "indicative of initial undercapitalization." 332 F.3d at 198.

    *Third*, as Special Master Vanaskie correctly concluded, the documentary record demonstrates that SoClean was undercapitalized in 2017. (R&R at 32.)  For one, SoClean Parent GP was capitalized with only $100 at the time DW created that entity. (*Id.* at 32 (citing JX257.009).)  SoClean Parent's formation documents themselves acknowledged that SoClean Parent GP was undercapitalized, requiring the limited partners to "forever release[] and

---

[9]    This is yet another instance where DW essentially seeks to remove private equity firms from even the potential for alter ego liability.  Private equity firms buy existing companies, so looking back to the capitalization of the company before the involvement of the private equity firm would result in this factor weighing against a finding of alter ego *in all cases*.

[10]    Dr. David Denis is the Terrence P. Laughlin Chair in Finance at the Katz Graduate School of Business, University of Pittsburgh and was admitted without objection or rebuttal as a "finance expert in capitalization and leverage." (Nov. 13, 2024 Evid. Hr'g Tr. at 8:12-16.)

discharge[] . . . and agree[] that it will make no claims against any . . . member, partner or holder of equity interests in the General Partner based upon any claims against the General Partner . . . arising under or in connection with this Agreement, *including under any 'veil piercing' or similar theor*y, and whether due to claims of *undercapitalization of the General Partner* or otherwise." (JX241.020 (emphasis added).)

Even more fundamentally, DW's buyout wholly—and negatively—transformed SoClean's financials. "[I]mmediately before the buyout, SoClean's total assets had grown from $7,169,831 in 2016 to $166,319,170 in 2017," and "SoClean had only 'a small amount of debt,' which 'it had been able to pay off' ahead of the DW transaction, leaving it with 'no debt whatsoever.'" (R&R at 33 (citing JX205.005 and Nov. 13, 2024 Evid. Hr'g Tr. at 11:1-12).) But "DW's leveraged buyout of SoClean immediately added $60 million in debt, with only $1.6 million going to support SoClean's operations." (*Id.* (citing Nov. 13, 2024 Evid. Hr'g Tr. at 15:14-16); *see also* PFF ¶¶ 207-09.) DW does not dispute these facts, but points to SoClean's "growth" in the year *after* the buyout and SoClean's "compliance with its White Oak debt covenants" as evidence that it was not undercapitalized. (Br. at 24.) But those arguments ignore SoClean's condition immediately following the buyout, including its $60 million in debt, which grossly outweighed SoClean's cash at the time. (*See* R&R at 33; Ex. C (comparing SoClean's debt to its cash and cash equivalent over time).) Special Master Vanaskie properly found that this evidence demonstrates that a "reasonably prudent individual[] with general business background would deem [SoClean] undercapitalized." (R&R at 31-33.)

### 5.    Siphoning

Although controlling shareholders are "entitled to . . . receive distributions of [company] profits," *Enterprise*, 735 F. Supp. 2d at 323, improper siphoning can occur when a controlling shareholder directs company funds to itself while, as here, the company has other

outstanding debt.  *See, e.g.*, *Lutyk*, 332 F.3d at 198 ("paying off [] the 'shareholder loans' to [the controlling shareholder], to the detriment of other creditors, [was] highly suspect"); *Holt*, 2011 WL 1135944, at *33 ("Courts have found siphoning of funds where a dominant stockholder withdraws funds from a declining entity, or causes the entity to repay stockholder loans while creditors remain unpaid."); *Cortland St. Recovery Corp.* v. *Bonderman*, 31 N.Y.3d 30, 48-49 (2018) (same).[11]  Further, as Special Master Vanaskie observed, evidence of SoClean's subsequent insolvency may be used "to give a closer examination of the conduct of managers and directors than would otherwise be assumed to be appropriate."  (R&R at 38 (citing *Lutyk*, 332 F.3d at 195).)[12]

Here, simultaneously with the buyout, "SoClean immediately added $60 million in debt, with only $1.6 million going to support SoClean's operations."  (R&R at 33 (citing Nov. 13, 2024 Evid. Hr'g Tr. at 15:14-16); *see* PFF ¶¶ 207-09.)  And within just nine months of the buyout, "SoClean took on another $38 million in debt" at the direction of DW.  (R&R at 33; *see* PFF ¶¶ 212-13; JX241.013; *see also* Ex. C.)  Even worse, this additional debt was not taken out to fund

---

[11]    *See also* R&R at 39; PFF ¶ 223 (citing *Lutyk*, 332 F.3d at 195-96; *Pisani*, 646 F.2d at 88-89; *Compagnie des Grands Hôtels d'Afrique S.A.* v. *Starwood Cap. Grp.*, 2019 WL 148454, at *4-5 (D. Del. Jan. 9, 2019).

[12]    DW takes issue with Special Master Vanaskie's observation of this jurisprudence because, according to DW, it sets forth a "broad proposition to support a finding of alter ego liability."  (Br. at 26.)  But DW never explains how the "cases do not support" the R&R's conclusions.  According to DW, *Compagnie* "involved a company that was completely insolvent at the time it made distributions" (*id.*), and *Holt* involved a "closely-held corporation" (*id.* at 29 n.15).  But the fact that the company was already insolvent in *Compagnie* was not central to the decision; the court mentioned the debtor corporation's insolvency only because the defendant argued that the payment of funds was contractually obligated.  *See Compagnie*, 2019 WL 148454, at *4.  And DW cites no evidence that SoClean is not closely held.  The IRS defines a closely held corporation as a corporation that "[h]as more than 50% of the value of its outstanding stock owned (directly or indirectly) by 5 or fewer individuals."  IRS, *Frequently Asked Questions:  Entities*, https://www.irs.gov/faqs/small-business-self-employed-other-business/entities/entities-5.  As shown by SoClean's capitalization table, over 50% of SoClean's stock is owned by less than five entities.  (JX118.046.)

SoClean's operations but instead to pay the DW Funds their full investment, plus 12%. (*Id.*; *see also* PFF ¶ 215.) Despite SoClean's massive debts, which heavily outweighed the approximate $3.5 million in cash that SoClean held following the buyout (JX205.014-.015), DW orchestrated $41 million in dividends from SoClean to benefit itself while putting SoClean into even *more* debt to do so. (R&R at 40-41; JX215.001; JX194.001.) Any claimed "growth" at SoClean in the year following the buyout merely reflects aggressive advertising spend under DW's new business model, which left SoClean further undercapitalized (PFF ¶¶ 83-97), and ignores that SoClean's net income (which considers interest expense, unlike SoClean's preferred EBITDA metric) declined after the buyout. (Nov. 13, 2024 Hr'g Tr. at 30:17-31:1.)[13]

DW relies on a single case to argue that its conduct did not constitute improper siphoning. (Br. at 25-26 (citing *Trinity Indus.* v. *Greenlease Holding Co.*, 2014 WL 1766083 (W.D. Pa. May 2, 2014)).) But *Trinity* only supports Special Master Vanaskie's decision.[14] *Trinity* states that "piercing the corporate veil is warranted based upon the siphoning of a subsidiary's assets only *when the parent has knowledge of the subsidiary's liabilities* when the assets are siphoned from the subsidiary." 2014 WL 1766083, at *13 (emphasis added). Not only does the record demonstrate that DW knew about SoClean's liabilities, it shows that DW *caused* SoClean to take on those liabilities. (R&R at 17, 49-51 (DW controlled SoClean's lending relationship with

---

[13]    As Special Master Vanaskie concluded, Dr. Denis provided compelling testimony that following the buyout, SoClean's financial position declined substantially. (R&R at 40 (citing Nov. 13, 2024 Evid. Hr'g Tr. at 44:11-15).) As a result of the "buyout debt alone" (*i.e.*, not even accounting for the debt taken out to fund the distributions), SoClean was already in "a very precarious financial position." (Nov. 13, 2024 Evid. Hr'g Tr. at 44:20-21.) The additional $38 million borrowed in 2018 put SoClean "in a position of a very high likelihood of bankruptcy by as early as 2019." (*Id.* at 44:22-25.)

[14]    As a preliminary and procedural matter, *Trinity* concerned alter ego *liability*, not the "less onerous" alter ego *jurisdiction* standard, as Special Master Vanaskie noted. (R&R at 23; *Sugartown Worldwide* v. *Shanks*, 129 F. Supp. 3d 201, 205-06 (E.D. Pa. 2015).)

White Oak).)  As discussed above, the documentary record shows that DW made the decisions

regarding the 2018 distributions—not only to do them, but also in what amounts and when—*before*

consulting with anyone at SoClean.  (PFF ¶¶ 93-114.)[15]  Special Master Vanaskie correctly

concluded that "[a]s the evidence makes clear that DW was the primary manager of the White Oak

relationship with SoClean, it is clear that DW was aware of SoClean's obligations to White Oak .

. . at the time it determined to issue the distributions."  (R&R at 41; *see* PFF ¶ 160.)[16]  Yet, DW

caused SoClean to issue dividends to the DW Funds and other A1 unitholders, rather than

prioritizing repayment of the buyout debt, which caused SoClean's financial position to decline

further.  (R&R at 40; *see* PFF ¶ 228.)

        DW also pretends that Special Master Vanaskie disregarded Mr. Gavin's testimony

on the origin and reasons for the distributions, thereby "tread[ing] on the business judgment rule"

and substituting his "own judgment about what is in a company's financial interest."  (Br. at 26,

27 n.12.)  This argument fails for four reasons.  *First*, the documentary record directly contradicts

Mr. Gavin's testimony, showing that the origin of the distributions was DW, not SoClean.  (*See,

e.g.*, JX272.001; JX225.001; JX279.001; JX224.001; JX226.002; JX215.010; JX212.001; PFF

¶¶ 98-114.)[17]  Special Master Vanaskie was well within his discretion to credit the documentary

---

[15]     Contrary to DW's description, *Trinity* does not provide that "[s]iphoning requires a
showing that . . . the subsidiary was undercapitalized" or that "the parent caused the distributions
specifically to avoid . . . liabilities that would cause [the subsidiary] financial distress." (Br. at 25.)

[16]     DW apparently believes that unless DW knew that SoClean's devices degraded foam,
siphoning cannot be supported. (Br. at 28.) DW's argument conflates the standards for alter ego
jurisdiction with those for fraudulent transfer. All of the relevant alter ego cases discuss other
financial liabilities, such as *whether the subsidiary had outstanding debt at the time of the alleged
siphoning*. *See, e.g.*, *Lutyk*, 332 F.3d at 198; *Holt*, 2011 WL 1135944, at *33; *Cortland St.
Recovery*, 31 N.Y.3d at 48-49.

[17]     Although DW claims that Special Master Vanaskie's conclusion lacks "a citation to any
record evidence" (Br. at 27), just a few pages later, the R&R cites copious evidence reflecting

record instead of Mr. Gavin's self-serving testimony.  *Second*, DW's argument conflates alter ego personal jurisdiction with fiduciary duties and the business judgment rule.  Although touching on similar concepts, DW cites no authority equating the standards.  *Third*, DW has waived any arguments about the hypothetical benefits the distributions may have provided SoClean, because DW makes these arguments for the first time in its objections.  *See In re Nat'l Collegiate Student Loan Trusts*, 971 F.3d 433, 444 (3d Cir. 2020) ("Arguments not presented to a magistrate judge and raised for the first time in objections to the magistrate's recommendations are deemed waived.").  *Fourth*, even if they could be considered, the stated reasons (*see* Br. at 27) all come back to benefitting DW in any event.  True, the additional debt allowed SoClean "to pay shareholder dividends without negatively impacting its working capital position" (*id.*), but 85% of the "shareholder dividends" simply went to the DW Funds.[18]  Similarly, even if these dividends "extinguished any further compounding of the 12% preferred return that would have continued to accrue on the company's books as well as the A1's distribution priority" (*id.*), the only reason the A1 unitholders received a "preferred return" or "priority" was the terms of the SoClean Parent LP Agreement (*see* JX241.013), which DW's Champsi signed on behalf of SoClean Parent (JX241.069).  In other words, there would have been no "preferred return" or "priority" group if DW had not created them, to its own advantage, in the first place.

Finally, DW contends that its later "investments" in SoClean absolve it of its prior siphoning.  (Br. at 28.)  The facts belie that argument.  DW's later "investment" began in July 2020 as a short-term $12.5 million loan to SoClean, which carried a *13% interest rate*.  (JX123.001-

---

DW's direction of the distributions.  (*See* R&R at 44-49 (citing, for example, JX241.021, JX272, JX283, JX215.010).)

[18]    The other 15% went to the other A1 unitholders.  The "old investors" in SoClean held A2 units and received nothing from the distributions.  (Nov. 13, 2024 Evid. Hr'g Tr. at 14:8-12, 23:4-23; PFF ¶ 94.)

002.)  To pay back that loan to DW (plus interest), SoClean was forced to take out *another* loan, this time from Silicon Valley Bank.  (Nov. 13, 2024 Hr'g Tr. at 25:3-15.)  Not only did SoClean take out another loan, it also conducted a round of fundraising (the "A4" round), *also* for the purpose of repaying DW.  (*Id.* at 25:23-26:4.)  The resulting A4 units carried a preferred *26% interest rate*, and on top of the fact that some of the capital raised through the A4 round went directly to DW (*id.* at 26:9-15), DW also received its own A4 shares—effectively trading its 13% interest rate from the short term loan for a 26% preferred rate through the A4s.  (*See id.* at 26:16-23.)[19]  In short, DW's purported "investments" in SoClean actually served DW's interests and are fully consistent with its siphoning.

### 6.    Whether SoClean Is Merely a Façade for DW

DW largely rinses and repeats its prior arguments regarding whether SoClean is merely a façade, arguing that Special Master Vanaskie allegedly "ignore[d] basic tenets of corporate law" by "disregarding the presumption that parent personnel who serve as subsidiary board members and officers are acting on behalf of the subsidiary in the first instance."  (Br. at 30.)  While failing to point to any specific examples, DW also claims that Special Master Vanaskie's "errors compound, causing the R&R to conclude, against all evidence, that SoClean . . . is in actuality a legal fiction."  (*Id.*)  But Special Master Vanaskie's entire analysis was conducted against the backdrop of the "presumption of corporate separateness," as he stated. (R&R at 24.)  With that principle in mind, Special Master Vanaskie conducted a detailed analysis rooted in the record, which supported the conclusion that DW exercised undue control over

---

[19]    DW also received similar preferred rates on its A5 "investment" of $10 million in December 2020.  (*See* JX099 (16% interest).)  On top of the preferred return on its limited "investment," this also helped stave off SoClean's bankruptcy, which would have been a black mark for DW (and Mr. Champsi in particular) if one of its portfolio companies went under.

SoClean. (*Id.* at 44-51.) DW, on the other hand, does not cite any portion of the record, other than the conclusory say-sos of Messrs. Champsi and Gavin.

Writ large, this factor is the same as the "Exercise of Control Over Subsidiary" factor that DW separately analyzes, because "control" underpins the entire alter ego analysis. (Br. at 20-22; *see* PFF ¶ 287.)[20] To the extent not already addressed in the other factors, the Philips parties address DW's remaining arguments here.

*First*, DW argues that "[t]here is nothing on the record rebutting the repeated witness testimony at the hearing that DW [] was not involved in the day-to-day operations of SoClean." (Br. at 20.) DW is just ignoring the record here. As demonstrated above and in the Philips parties' Proposed Findings of Fact and Conclusions of Law, substantial *documentary* evidence demonstrates DW's day-to-day control, especially over key decisions that would affect SoClean. (*E.g.*, PFF ¶¶ 286-306.) For instance, following the buyout, DW became heavily involved in designing and implementing a new filter kit sales model for SoClean. (PFF ¶¶ 277-79.) DW was so interested in overhauling SoClean's business model that in 2018, a DW associate temporarily relocated to work on the filter kit project out of SoClean's New Hampshire facility. (Nov. 13, 2024 Evid. Hr'g Tr. at 202:11-20.) DW also spearheaded—including by providing instruction to SoClean personnel—the plan to turbocharge SoClean's marketing and advertising spend, increasing SoClean's marketing from $25.67 million in 2017 to approximately $59.89 million in 2018. (*See* JX180.006.) To do so, DW brought on its own marketing specialist, Jeff Hicks—the "Secondary DW Representative" (JX241.110)—who worked with SoClean's marketing team to overhaul SoClean's business model by terminating many of SoClean's

---

[20] Indeed, in DW's standalone "control" factor discussion, DW takes issue with Special Master Vanaskie's discussion of *Simeone* (Br. at 21-22), but Special Master Vanaskie discusses *Simeone* in the context of whether SoClean is a façade. (R&R at 44; *see also id.* at 35.)

distributor contracts and switching to a "direct-to-consumer" sales model.  (Nov. 13, 2024 Evid. Hr'g Tr. at 99:4-7, 169:4-10.)   As Special Master Vanaskie observed, DW also controlled SoClean's lending relationships (especially with White Oak) and was chiefly responsible for negotiating the terms of SoClean's debt.  (PFF ¶¶ 160-173.)  Then, in 2020, DW told SoClean's CEO to "tak[e] [SoClean] just down to a shell and cut[] all advertising and sell[] just filter kits" (JX110.001), which plainly rebuts DW's suggestion that it merely "request[ed] to see a business plan for the filter kit business" (Br. at 20).   DW also controlled other minutiae of SoClean's operations, such as hand-selecting SoClean's outside counsel and shaping legal strategy (PFF ¶¶ 174-78), and hiring and firing SoClean personnel (JX241.021; Nov. 13, 2024 Evid. Hr'g Tr. at 174:1-176:17).   In the face of that record, the conclusory "witness testimony at the hearing" (Br. at 20) hardly holds up.  *See Simeone*, 360 F. Supp. 2d at 678.

       *Second*, DW drastically understates DW's ability to control SoClean.  (Br. at 20-21.)  In particular, although DW concedes that its representatives had majority voting power on each SoClean board, DW says that power never had to be exercised because of the "unanimous agreement" of the boards on all decisions.  (*Id.*)  The supposed unanimity is more form than substance given the voting power DW had.   DW wants this Court to believe that other board members would have voted in opposition to DW, but even Mr. Champsi admitted that no board members could "take a position that would win the day" if they chose to contradict DW's position. (Nov. 13, 2024 Hr'g Tr. at 139:2-3.)  And through its negative control rights, DW ensured that it would "maintain control over [SoClean]," *UHS of Del., Inc.* v. *United Health Servs.*, 2015 WL 539736, at *7 (M.D. Pa. Feb. 10, 2015), because SoClean Parent could never "increase or decrease the size of the board of Managers or the votes each board Member may case" without DW's express approval.  (JX241.021.)

*Third*, DW claims that the Advisory Agreement should have no bearing on the alter ego inquiry because it was an "arms-length agreement" (Br. at 14) and that Special Master Vanaskie erred in observing that this Agreement allowed DW to "unilaterally make decisions for SoClean" (*id.* at 21). As a preliminary matter, there is no evidence that the Advisory Agreement resulted from "arms-length" negotiations, particularly given that it was entered into in connection with the DW-manufactured buyout. Further, just as Special Master Vanaskie found, DW had the right under the Advisory Agreement to engage in SoClean's business "in such manner and on such business and financial matters *as [DW] shall reasonably determine*, which services shall include, *without limitation*, providing operational consulting, reviewing requests for proposals for competitive bidding of services and products for SoClean, attending periodic meetings, providing other services related to business plans and strategy, accounting systems and controls, financing and bank relationships, customer and supplier relationships, and review and analysis of capital expenditures." (JX244.001 (emphasis added).) Accordingly, Special Master Vanaskie correctly observed that "[t]he decisions as to what matters DW would insert itself on were 'determined solely by DW.'" (R&R at 12 (citing JX244.001).) The mere fact the Advisory Agreement stated that DW did not have the right to "create any obligations on behalf of or in the name of [SoClean]" (Br. at 21) does not help DW. As the record shows, DW disregarded that provision, as DW "consistently signed documents on behalf of SoClean entities" (R&R at 13), including by listing DW itself (instead of SoClean) on contracts (JX207.011; *id.* at -.015).[21]

---

[21]    DW apparently expects this Court to conclude that the *one* provision in the SoClean entities' governing documents that purports to limit DW's powers constitutes evidence of DW's lack of control while simultaneously discounting as mere "paper rights" all the provisions that *do* grant DW power. (Br. at 20.) In other words, according to DW, if a provision supports DW's argument, it is reliable evidence, but if it contradicts DW's argument, it is not.

The facts here are strikingly similar to those in *Simeone*, as Special Master Vanaskie concluded.  (*See* PFF ¶¶ 288-306.)  DW acknowledges that in *Simeone*, the controlling shareholder "had the power to hire and fire" the subsidiary's "general manager," "performed quarterly reviews of [the subsidiary's] business," and "determined [the subsidiary's] budget." (Br. at 22.)  Just as in *Simeone*, DW had the ability to hire and fire SoClean personnel (JX241.021; Nov. 13, 2024 Evid. Hr'g Tr. at 174:1-176:17), controlled SoClean's budget (JX146.001, JX104.001; PX005.001; JX110.001; JX144.001; PFF ¶ 303), and conducted reviews of SoClean's "performance versus [its] budget" by requiring that SoClean provide DW with monthly financial statements (*e.g.*, JX111; JX112; JX153; JX170; JX188; PX005).  And DW does not dispute that, as in *Simeone*, DW held majority voting power on the board, which "served as [the] vehicle for exchanging information about 'any major business issues.'"  360 F. Supp. 2d at 676.  Instead, DW merely asserts that this case is different because the "board decisions were unanimous and the testimony and evidence is clear that no DW[] entity ever directed any SoClean entity or person to do something that they did not want to do." (Br. at 22 (only citing testimony).)  But for the reasons already explained, those arguments are inconsistent with the record and entirely unpersuasive.

One final note:  DW fearmongers by suggesting that the R&R "would set a deeply problematic precedent" by "liberaliz[ing]" the alter ego doctrine to apply to "run-of-the-mill private equity investment relationships." (Br. at 1, 30.)  But the only evidence before this Court is of the relationship between, and business practices employed by, *DW and SoClean*.  Even more, DW has not even attempted to establish that so-called "run-of-the-mill private equity investment relationships" involve, for instance, (i) issuing dividends to the private equity firm while the portfolio company is already massively in debt—and needs to take on even more debt to fund the distributions; (ii) "gut[ting]" their portfolio companies and taking them down to a "shell"

-29-

(JX110.001); or (iii) that private equity firms always take "control or near-control" of their portfolio companies, as DW concedes it did here (JX002.020; Nov. 13, 2024 Evid. Hr'g Tr. at 125:16-126:3, 141:7-142:4). Other private equity investors in SoClean respected their role as *investors* and did not act toward SoClean as DW did. (*See* Br. at 5-6.)[22] The Court should reject DW's attempt to avoid *its own* conduct by suggesting, without *any* evidence, that "everyone else is doing it too."

## CONCLUSION

The Court should adopt Special Master Vanaskie's R&R and deny DW's motion to dismiss in its entirety.

---

[22] As DW points out, other private equity funds were also holders of A1 units in SoClean Parent. (Br. at 5-6.) The difference in the powers wielded over SoClean by those funds as compared to those wielded by DW is precisely why only DW, not the other private equity investors, faces alter ego liability.

Dated: April 1, 2025     Respectfully submitted,

          /s/ *William B. Monahan*
          Tracy Richelle High (NY Bar No. 3020096)
          William B. Monahan (NY Bar No. 4229027)
          SULLIVAN & CROMWELL LLP
          125 Broad Street
          New York, NY  10004-2498
          Tel:  (212) 558-4000
          Fax:  (212) 558-3588
          hight@sullcrom.com
          monahanw@sullcrom.com

          Michael H. Steinberg (of counsel)
          SULLIVAN & CROMWELL LLP
          1888 Century Park East
          Los Angeles, CA  90067
          Tel:  (310) 712-6670
          Fax:  (310) 712-8800
          steinbergm@sullcrom.com

          *Counsel for Philips North America LLC*

          /s/ *Erik T. Koons*
          Erik T. Koons (NY Bar No. 2941102)
          BAKER BOTTS LLP
          700 K Street, NW
          Washington, DC  20001
          Tel:  (202) 639-7973
          Fax:  (202) 585-1086
          erik.koons@bakerbotts.com

          /s/ *Andrew T. George*
          Andrew T. George (PA Bar No. 208618)
          BOURELLY, GEORGE + BRODEY PLLC
          1050 30th Street, NW
          Washington, DC  20007
          Tel:  (202) 753-5012
          Fax:  (703) 465-8104
          andrew.george@bgblawyers.com

          *Counsel for Philips RS North America LLC*