## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: SOCLEAN, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Master Docket: No. 22-MC-00152-JFC<br><br>MDL No. 3021 |
| This Document Relates to: | |
| *SoClean, Inc. v. Koninklikje Philips N.V., et al.,* 2:22-cv-542<br>PHILIPS NORTH AMERICA LLC, and PHILIPS RS NORTH AMERICA LLC,<br>　　　　　Counterclaim-Plaintiffs,<br><br>v.<br><br>SOCLEAN, INC. and DW MANAGEMENT SERVICES, LLC,<br><br>　　　　Counterclaim-Defendants. | |

**REPORT AND RECOMMENDATION REGARDING SOCLEAN, INC.'S MOTION TO EXCLUDE AND STRIKE CERTAIN OPINIONS OF PHILIPS' DAMAGES EXPERT MARIA E. GARIBOTTI, PH.D.**

### I.     INTRODUCTION

This action, part of multidistrict litigation number 3021 ("MDL 3021"), concerns the sale of various cleaning devices by plaintiff, SoClean, Inc. ("SoClean"). Defendants Philips RS North America LLC ("Philips RS"), and Phillips North America LLC ("Philips NA" and with Philips RS, collectively "Philips") have filed

1

Counterclaims ("Counterclaims"), alleging that SoClean made certain untrue statements using the Philips' trademarks and about their products which caused them harm. Currently pending before the Court is SoClean's Motion to Exclude the Opinions and Testimony of Philips' damages expert, Dr. Maria Garibotti ("Motion"). (ECF No. 953). For the reasons set forth in the Report & Recommendation below, it is recommended that SoClean's motion be denied.[1]

## II.    PROCEDURAL HISTORY

The operative pleadings in this matter are SoClean's second amended complaint, filed on October 10, 2022 (ECF No. 211), and Philips' corrected Amended Counterclaim, filed on November 21, 2024. (ECF No. 802). The Amended Counterclaim was filed following this Court's October 8, 2024 Memorandum Opinion and accompanying Order (ECF Nos. 718 and 719), which adopted in part the Special Master's May 29, 2024 Report and Recommendation concerning SoClean's motion to dismiss.

On May 22, 2025, SoClean moved to exclude the opinions of Philips' damages expert, Dr. Garibotti. (ECF No. 953). On June 5, 2025, Philips filed a brief in opposition to the Motion. (ECF No. 986). On July 2, 2025, the parties presented evidence and argument on the Motion. (July 2, 2025 Hearing Tr. (ECF No. 1024)). During the hearing on July 2, 2025, Judge Conti denied SoClean's motion as to Dr.

---

[1] By Order filed on March 15, 2024, the Court appointed the undersigned as Special Master to "prepare Reports & Recommendations concerning the substantive motions filed in this MDL." (ECF No. 581).

Garibotti's assumption that Philips RS bore the costs of the product recall at the heart of this case, and referred all other issues on the SoClean Motion to the Special Master for a Report and Recommendation. (ECF No. 1024). On July 18, 2025, Philips sought leave to file a supplemental memorandum in opposition to the Motion, which the Court granted. (ECF Nos. 1029, 1033, 1034). SoClean filed a supplemental memorandum in support of the Motion on August 1, 2025. (ECF No. 1036). The Motion is ripe for disposition.[2]

## III.   BACKGROUND[3]

Philips develops, manufactures, markets, and sells continuous positive airway pressure machines (CPAPs) and bilevel positive airway pressure machines (BiPAPs) (collectively, "PAPs") (ECF No. 802 at ¶ 25). SoClean manufactures and markets automated cleaning devices, device filters, and adapters used to connect the cleaning devices to PAP machines, including those produced by Philips. (*Id.* at ¶ 29). The SoClean devices utilize ozone to clean and sanitize. (*Id.*). Although useful for cleaning and sanitizing, ozone can cause a range of adverse reactions in humans, including lung damage, chest pain, coughing, shortness of breath, throat irritation, and compromised respiratory immunity. (*Id.* at ¶ 2). Ozone can also have a corrosive effect on some materials, causing them to degrade. One of the at-risk materials is the

---

[2] Although many of the documents that the parties rely on were filed under seal, the Special Master determined that this opinion need not be sealed. The parties, of course, are free to request that it be sealed.
[3] This Report assumes a level of familiarity with the underlying facts and will only briefly recount the background of this matter.

polyester-based polyurethane ("PE-PUR") sound abatement foam found in the Philips PAPs. (*Id*.).

Philips alleges that SoClean has known for several years that the ozone produced by its cleaning devices creates a foam degradation problem with PAP machines, including Philips PAPs. (*Id.* at ¶¶ 1, 3, 5). Notwithstanding the foam degradation problems revealed by testing, SoClean touted the supposed compatibility of its cleaning devices with Philips PAPs. (*Id.* at ¶ 1). SoClean's promotional materials contained images of Philips PAPs, bearing the Philips' logo, marks, and trademarks. (*Id.* at 33). In addition, SoClean's marketing materials also used the Philips' marks and trademarks, including "Philips," "Respironics," and "DreamStation," among others. (*Id.*).

In February 2020, the FDA issued a Safety Communication informing the public at large of the potential dangers of devices using ozone to clean PAPs. (*Id*. at ¶ 49). The Safety Communication noted that such devices "are not legally marketed for this use by FDA in the U.S., and as such, their safety and effectiveness for use with CPAP devices and accessories is unknown." (*Id*.). The Safety Communication also recommended that the public "follow the cleaning instructions provided by the CPAP's manufacturer, which normally include regular cleaning with soap and water." (*Id*. at ¶ 5). Philips alleges that prior to August of 2024, the FDA had not

approved or cleared for legal marketing any ozone-based PAP cleaning device. (*Id.* at ¶ 12).[4]

In June 2021, Philips voluntarily elected to recall certain PAP machines containing PE-PUR foam. (*Id.* at ¶ 6). The FDA instructed Philips to "[m]aintain prominently displayed information on the risk of using ozone cleaners" to put the public on notice that the "use of ozone cleaners to disinfect or sanitize the Recalled Products may exacerbate the breakdown of the foam." (*Id.*). After initiating the voluntary recall, Philips alleges that it undertook extensive testing that confirmed that ozone "drastically increased" the risk that PE-PUR foam would degrade in Philips PAPs. (*Id.* at ¶ 8).

Both SoClean and Philips assert they have suffered harms stemming from the underlying events and recall. SoClean alleges Philips knew that the foam degraded without the presence of ozone years prior to the recall but formulated the recall notice to mislead consumers that ozone and ozone cleaners were responsible for the foam degradation. (ECF No. 211 at ¶ 8). SoClean contends that Philips disparaged ozone cleaners to harm SoClean and negatively impact competition between the two brands. (*Id.* at ¶ 13).

---

[4] The FDA, in August of 2024, approved the SoClean 3+ "to be used as an adjunct to reduce bacterial populations on certain compatible home use CPAP mask and ventilation hoses after cleaning." https://www.soclean.com/soclean3/sleep-talk/soclean-obtains-fda-clearance (last visited September 10, 2025). It is unclear whether SoClean has begun selling the SoClean 3+.

Philips contends that the marketing of SoClean's devices as compatible with Philips' products "contributed in large part to [its] decision to initiate a voluntary recall of potentially affected products in 2021." (ECF No. 802 at ¶ 78). Philips further alleges that SoClean's "false statements about product compatibility tarnish the valuable and hard-earned goodwill that [it] has achieved in its brand." (*Id*. at ¶ 79).

SoClean has moved to preclude or limit the testimony of Philips' damages expert, Dr. Garibotti. Judge Conti has referred the motion to the undersigned for Report & Recommendation. (ECF No. 1024; July 2, 2025 Hearing Tr. at 117:1-2). For the reasons that follow, it is recommended that SoClean's motion be denied.

## IV.   STANDARD OF REVIEW

In evaluating a motion to exclude expert testimony, the Court acts as a gatekeeper to ensure that the expert testimony is both relevant and reliable under Federal Rule of Evidence 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993). A court's inquiry under Rule 702 is a flexible one with a focus on the principles and methodology underlying the expert opinion, rather than the ultimate conclusions of the expert. (*Id*. at 594-95). A court's gatekeeping function is to be undertaken rigorously as the court must ensure that all evidence satisfies the standard for reliability and relevance, and thus admissibility. (*Id*. at 590).

To be admissible, an expert opinion must satisfy three distinct criteria: (1) the expert must be qualified; (2) the proposed testimony must be reliable and concerns matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony is "'sufficiently tied to the facts of the case'" so that it "'fits'" the dispute and will assist the trier of fact. *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025) (quoting *Daubert*, 509 U.S. at 591). The party offering the expert testimony bears the burden of demonstrating that the expert satisfies each of these criteria by a preponderance of the evidence. *Hartle v. FirstEnergy Generation Corp.*, 7 F. Supp. 3d 510, 514 (W.D. Pa. 2014).

To be qualified, an expert must "possess specialized knowledge." Fed. R. Evidence 702. The Third Circuit has noted that Rule 702's qualification requirement should be interpreted liberally such that "a broad range of knowledge, skills, and training qualify an expert." *Pineda v. Ford Motor Co*., 520 F.3d 237, 244 (3d Cir. 2008).

To be reliable, an expert opinion must be "based on the methods and procedures of science, not on subjective belief and unsupported speculation." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80-81 (3d Cir. 2017). Reliability does not require that the opinion have "the best foundation" or even be "supported by the best methodology or unassailable research" but merely must be supported by "good

grounds." *Cohen*, 125 F.4th at 462 (citing *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020)).

All aspects of an expert's report must be supported by good grounds, including the expert's methodology, the facts underlying the opinion, and the link between the facts and the conclusion. *Id.* (citing *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012)). There is no single check list to determine whether an expert's opinion is supported by good grounds, but courts look to the following eight factors for guidance: (1) whether the expert's opinion rests on a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the operation of the expert's methodology; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Id.* (citing *UGI Sunbury*, 949 F.3d at 834). No single factor is dispositive. *Id.*

In assessing a scientific expert's opinions, the party offering the opinion does not need to prove that the expert's conclusions are correct. *See U.S. v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (citing *Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)). Arguments regarding whether a conclusion is correct should instead "'be tested by the adversary process – competing expert testimony

and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.'" *Id*. Accordingly, the Court is not required to assess which of several competing scientific theories is best but must ensure that the party offering the evidence has demonstrated that "the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Id*.

To have the requisite "fit" to the underlying matter, the expert opinion must "help the trier of fact to understand the evidence or to determine a fact in issue." *Cohen*, 125 F.4th at 464 (citing *UGI Sunbury*, 949 F.3d at 835). Essentially, an expert opinion must be scientific knowledge for the purposes of the case, rather than scientific knowledge for an unrelated purpose. *Id*.

If an expert fails to satisfy each of these criteria, the court should exclude the expert's opinion. *Id*. at 460.

## V.    ANALYSIS

There are three main categories of damages sought by Philips addressed in Dr. Garibotti's initial report: (1) the disgorgement of profits realized by SoClean from sales generated by its allegedly false representations; (2) the testing costs incurred by Philips to assess the impact of ozone on Philips' PAPs ("Ozone Testing Costs"); and (3) the costs incurred by Philips for its recall of PAPs used with SoClean's ozone devices ("Recall Costs"). Dr. Garibotti issued a second report that

responded to the damages opinions of Dr. Bell and calculated prejudgment interest.

SoClean challenges both Dr. Garibotti's affirmative opinions as well as her opinions

expressed in her rebuttal report.[5]

First, SoClean challenges Dr. Garibotti's conclusion that $1 million of the

Ozone Testing Costs incurred by Philips are allocable to SoClean, contending the

opinion lacks reliable inputs and has no clear methodology. (ECF No. 954 at 6).

SoClean asserts a similar argument to challenge Dr. Garibotti's allocation of Recall

Costs to SoClean. (*Id*. at 10).

Second, SoClean contends that Dr. Garibotti's opinions offered to rebut

SoClean's damages impermissibly rely on a third-party valuation of SoClean. (*Id*. at

12). In addition to these arguments, SoClean also contends that Dr. Garibotti's

opinions regarding Philips' prejudgment interest and opinions incorporating exhibits

served after the close of expert discovery should be stricken as untimely and

improper. (*Id*. at 14).

In opposition, Philips contends that SoClean's objections ignore both the

sources cited by Dr. Garibotti that refute SoClean's arguments as well as the role of

an economic damages expert. (ECF No. 986 at 1). As to SoClean's challenges to Dr.

Garibotti's allocation of Ozone Testing Costs and Recall Costs based upon

---

[5] Pursuant to Judge Conti's order during the July 2 hearing, it is understood that SoClean's motion is denied in regards to its argument regarding Dr. Garibotti's allocation of costs to Philips RS. *See* July 2, 2025 Hearing Tr. at 121:3-7; (ECF No. 1024) ("The motion is denied in part with respect to [Dr. Garibotti's assumption that Philips RS bore the recall costs.").

SoClean's market share, Philips notes that SoClean cites no authority to support that Dr. Garibotti's use of SoClean's market share data was inappropriate. (*Id*.). Regarding Dr. Garibotti's allocation of Recall Costs to SoClean, Philips contends that the law does not excuse SoClean from a proportional share of the Recall Costs because there may have been other reasons for the recall. (*Id*.) (citing *AMCO*, 926 F. Supp. 2d 634, 647 (W.D. Pa. 2013)).  Philips likewise counters SoClean's contention that Dr. Garibotti's discount of SoClean's Recall Costs was improper as, on the one hand unreasonable because the discount limited SoClean's alleged responsibility, and on the other, unfounded because Dr. Garibotti relied on the results of testing that supported the extent to which ozone accelerated ozone degradation. (*Id*.).

Finally, Philips refutes SoClean's arguments  regarding prejudgment interest and the timeliness of Philips' supplemental exhibits.  (ECF No. 986 at 2). Philips contends that the timing of Dr. Garibotti's rebuttal opinion mirrors the burden-shifting framework for disgorgement under the Lanham Act and Dr. Garibotti could only calculate SoClean's alleged ill-gotten profits after Dr. Bell submitted his opinion as to SoClean's costs. (*Id*.).

### A. Allocation of Ozone Testing Costs to SoClean

#### i. Reliance on Mr. Bennik's Work

SoClean's challenges Dr. Garibotti's conclusion that $1 million of Philips' Ozone Testing Costs are allocable to SoClean and DW, challenging both the lack of documentary support for Dr. Garibotti's conclusions as well as her methodology in allocating Ozone Testing Costs to SoClean. (ECF No. 954 at 6-9). SoClean's arguments really concern Mr. Bennik because Dr. Garibotti relies on spreadsheets created by Mr. Bennik to determine the total Ozone Testing Costs. (*Id*. at 7).

First, SoClean contends that Mr. Bennik's spreadsheet is an unreliable source because it lacks an evidentiary basis and is, according to SoClean, a list of costs that Mr. Bennik considered to be related to ozone testing. (*Id*. at 6). SoClean recognizes that Dr. Garibotti subsequently interviewed Mr. Bennik to understand the spreadsheet. (*Id*. at 7). However, SoClean observes that Mr. Bennik could not support his decisions with invoices or other documents and that Dr. Garibotti could not explain how or why Mr. Bennik identified costs for inclusion in the spreadsheet and whether Mr. Bennik had any assistance in creating the spreadsheet. (*Id*.). SoClean cites the largest entry in the spreadsheet – €1.619 million for "Cross-charge IEN-SRC" – and contends that no invoice was available to support this entry. (*Id*. at 7-8). Without supporting documentation, SoClean contends that Dr. Garibotti was unable to independently validate Mr. Bennik's work. (*Id*.).

12

In response, Philips contends that experts are permitted to rely on facts learned out of court in forming their opinions. (ECF No. 986 at 7) (citing *Stecyk v. Bell Helicopter Textron*, 295 F.3d 408, 414 (3d Cir. 2002) and *Robert Billet Promotions v. IMI Cornelius*, 1998 WL 151806, at *5 (E.D. Pa. 1998)). Philips defends Dr. Garibotti's methodology for calculating the Ozone Testing Costs, asserting that she undertook a review of documentary evidence and interviewed Mr. Bennik to understand the inputs into the spreadsheet. (*Id.* at 6-7). As an example of the meticulous nature of Dr. Garibotti's review, Philips contends that Dr. Garibotti identified and corrected two errors in Mr. Bennik's work. (*Id.* at 6).

The Third Circuit has noted that the standard for reliability of an expert's opinion is not high. *Karlo*, 849 F.3d at 80-81. For an expert's opinion to be reliable the opinion does not need to have "the best foundation" or even be "supported by the best methodology or unassailable research" but merely must be supported by "good grounds." *Cohen*, 125 F.4th at 462. An expert is not required to consider all possible factors for an opinion to be reliable. *Pfizer Inc. v. Teva Pharm. USA, Inc.*, 461 F. Supp. 2d 271, 274 (D.N.J. 2006); *Select Comfort Corp. v. Tempur Sealy Int.l, Inc.*, 2016 WL 5496340, at *7 (D. Minn. 2016). The Third Circuit has instructed that "[a] party confronted with an expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination." *Stecyk*, 295 F.3d at 414. Whether

13

an expert should have considered additional variables and facts is an issue that goes to the weight of testimony, rather than its admissibility. *See TAKTL, LLC v. IWR, North America, LLC*, 2024 WL 4415194, at *5 (W.D. Pa. Oct. 4, 2024).

Both parties cite *In re TMI*. 193 F.3d at 613; (ECF No. 954 at 9; ECF No. 986 at 7). There, the Third Circuit affirmed the exclusion of an expert's opinion based on summary fact sheets *created by plaintiffs' counsel*. 193 F.3d at 705-06. Philips contends that *In re TMI* is distinguishable because here, by way of contrast, the spreadsheet was not prepared by counsel and evidence was provided regarding the source of information in the spreadsheets. (ECF No. 986 at 7). Philips likewise contends that SoClean's argument that Dr. Garibotti needed to validate the data in another spreadsheet – the Labor Spreadsheet wherein Mr. Bennik collected data regarding the amount of time employees spent on recall-related activities – asks too much of an economics expert. (*Id*.). Philips further contends that Dr. Garibotti did undertake a review of the source data through her interview with Mr. Bennik (*Id*. at 6-8).

A review of Dr. Garibotti's opening expert report demonstrates that Dr. Garibotti undertook a review of Mr. Bennik's work that exceeds SoClean's characterization. While SoClean represents that Dr. Garibotti "just adds together the costs listed in a single Excel spreadsheet prepared by Mr. Bennik," Dr. Garibotti spells out how she critically analyzed Mr. Bennik's work in her report. (ECF No.

954 at 6; 954-2 at ¶¶ 56-60). Specifically, as to the Ozone Testing Costs contained in Mr. Bennik's spreadsheet, Dr. Garibotti explained that she (i) reviewed the invoices underlying the spreadsheet entries where available to determine whether they pertained to ozone-related testing; (ii) confirmed the spreadsheet entries for which no invoice was available by comparing the entry to the Labor Spreadsheet and by interviewing Mr. Bennik; (iii) converted the confirmed costs pulled from the Ozone-Related Testing Spreadsheet and converted the amount to dollars; and (iv) allocated SoClean's portion of the converted sum by considering the portion of this amount attributable to both U.S. machines compatible with SoClean devices and SoClean's share of the CPAP market in the United States. (ECF No. 954-2 at ¶¶ 56-57). For three of the four entries where invoices were unavailable, Dr. Garibotti either found support in other materials available to her or discounted the final amount to account for the lack of support. (*Id*. at ¶ 60(a)-(c)).[6] These steps demonstrate Dr. Garibotti's review was far from a wholesale adoption of Mr. Bennik's work that SoClean alleges.

However, Dr. Garibotti's reliance on Mr. Bennik's Labor Costs spreadsheet presents additional concern. SoClean faults Dr. Garibotti for relying on Mr. Bennik's work because "[a]lthough Dr. Garibotti indicates that she sought to corroborate the

---

[6] For example, Dr. Garibotti noted a 2,000 EUR discrepancy. (ECF No. 954-2 at ¶ 60(c)). To account for this discrepancy, Dr. Garibotti revised the amount recorded in the Ozone Testing Calculation to match the amount observed in the invoice. (*Id*.).

amounts listed in Mr. Bennik's spreadsheet, for the vast majority of the total amount listed, she was not provided with any supporting invoices." (ECF No. 954 at 7). This point appears to be directed at the entry on Mr. Bennik's spreadsheet for €1,619,000 for "cross-charge IEN-SRC." (*Id.*). Dr. Garibotti recognized that she was not provided an invoice for this substantial sum but explains that she sought to corroborate the number with another spreadsheet prepared by Mr. Bennik - the Labor Cost spreadsheet - estimating the time employees spent on activities related to ozone-related testing which was charged internally to Philips RS. (ECF No. 954-2 at ¶ 60(d)).

Because Dr. Garibotti discussed the Labor Costs spreadsheet with Mr. Bennik, Dr. Garibotti's opinion incorporating the Labor Costs spreadsheet as support for the €1,619,000.00 entry rests on sufficient grounds for admission, but appears to be an instance where Dr. Garibotti could have considered additional sources to assess the veracity of the entry. That Dr. Garibotti could have considered more does not render her opinion as to Ozone Testing Costs inadmissible. *See Stecyk*, 295 F.3d at 414. Dr. Garibotti's subsequent discussion of this work with Mr. Bennik renders this evidence reliable for purposes of admissibility.

### ii.    Dr. Garibotti's Allocation Methodology

SoClean also challenges Dr. Garibotti's methodology for calculating her allocation of the Ozone Testing Costs to SoClean. (ECF No. 954 at 9). SoClean

challenges Dr. Garibotti's decision to first reduce the total amount of Ozone Testing Costs – approximately € 2.1 million – by the fraction of Philips CPAP devices in the United States relative to the total number worldwide and then apply SoClean's alleged share of the CPAP cleaning device market – which Dr. Garibotti estimates is 75%. (*Id.*). SoClean contends that this calculation lacks an economically rational reason for its apportionment to SoClean. (*Id.*).

Philips cites several cases that support the use of market-share data to allocate damages. (ECF No. 986 at 8) (citing *In re Domestic Drywall Antitrust Litig.*, 2020 WL 1695434, at *22 (E.D. Pa. 2020); *Church & Dwight v. SPD Swiss Precision Diags.*, 2018 WL 4253181, at *10 (S.D.N.Y. 2018)). Philips is correct that use of market share has been recognized as an input to calculate damages. *See In re Domestic Drywall Antitrust Litig.*, 2020 WL 1695434, at *22-24; *ZF Meritor*, 696 F.3d at 295-300. This method is sufficiently reliable for purposes of admissibility.

### iii.    The Reliability and Fit of Dr. Garibotti's Allocation of Recall Costs to SoClean

SoClean contends that Dr. Garibotti's opinion regarding Recall Costs attributable to SoClean is unreliable and does not fit the facts of this case because it fails to account for the scope of the recall. (ECF No. 954 at 10). Because the recall included *all* Philips CPAP devices, regardless of the use of an ozone cleaner, SoClean contends that Dr. Garibotti's failure to account for this fact renders her opinion unreliable. (*Id.*). In response, Philips contends that SoClean's argument

17

would create blanket immunity for any party that contributed to the recall but whose actions were not the sole cause of the recall. (ECF No. 986 at 9). Philips contends that this is not the law. (*Id*.) (citing cases in support including *AMCO Ins. v. Emery & Associates*, 926 F. Supp. 2d 634, 647 (W.D. Pa. 2013), *Fischer v. Governor of N.J.*, 842 Fed. App'x 741, 756 (3d Cir. 2021), *Jones v. Montefiore Hosp.*, 494 Pa. 410, 416 (1981), *Carignan v. N.H. Int'l Speedway*, 151 N.H. 409, 414 (2004)))

SoClean also challenges Dr. Garibotti's methodology in calculating the Recall Costs. (ECF No. 954 at 10-11). SoClean first contends that Dr. Garibotti's calculations of Recall Costs  is based upon self-reported ozone usage, including information from users who did not recall whether they used an ozone cleaning device or simply did not respond. (*Id*.).[7]  SoClean also challenges Dr. Garibotti's adjustment to the Recall Costs based on "acceleration factors" derived from two of Philips' technical analyses, including the Hawkins Phase 1 test that sought to predict the time it took for PE-PUR foam to lose its tensile strength at different temperatures, humidities, and ozone exposure as well as Philips' visual inspection testing. (*Id*. at 11). According to SoClean, Dr. Garibotti's consideration of these technical analyses renders her opinions unreliable because she lacks the scientific expertise to consider

---

[7] These users responded to the prompt regarding whether ozone or activated oxygen has been used on a Recalled Device with "unknown" or left the response blank. *See* ECF No. 954-2 at ¶ 41, n. 64 and 65.

this data and did not review any underlying data. (*Id*.). Relying on *Paoli II*, SoClean contends this failure to review data renders Dr. Garibotti's opinion unreliable. (*Id*.).

In response, Philips contends that this type of challenge is best reserved for cross examination and not the proper focus of a *Daubert* Motion. (ECF No. 986 at 9). As to Dr. Garibotti's inclusion of those self-reported responses regarding ozone use that responded "don't know/unknown", Philips asserts that Dr. Garibotti's pro rata inclusion of this data based upon the ratio of total yes responses to the total of all responses was appropriate because these responses do not fit within the factual binary of whether ozone was used with a device and treating each of these responses as a "no" would be improper. (*Id*. at 9-10). Philips also defends Dr. Garibotti's downward adjustment of the Recall Costs attributable to SoClean based upon acceleration of degradation estimates and contends that contrary to SoClean's argument, Dr. Garibotti had no obligation to confirm the scientific validity of the testing results regarding ozone's impact on foam degradation. (*Id*. at 10-11). Rather, Philips represents that Dr. Garibotti's reliance on findings from outside her field was expected. (*Id*. at 11) (citing *Ford v. Ford Motor Co*., 311 F. Supp. 3d 667, 676 (D.N.J. 2017)).

Following the conclusion of the hearing on the parties' *Daubert* motions, Philips submitted a supplemental memorandum in opposition to SoClean's motion. (ECF No. 1034). Philips' supplemental memorandum provides additional arguments

to respond to SoClean's arguments raised during the hearing regarding Philips' ability to prove but-for causation. (*Id*. at 1). Philips contends that the Lanham Act does not require but-for causation and asserts that this case is an instance of multiple-sufficient causes. (*Id*. at 5). Philips contends that while the recall would have centered on the same Philips' products regardless of SoClean's devices, there is no evidence that the Recall Costs would have been identical without SoClean's claims and products. (*Id*. at 7).

During oral argument, counsel for Philips directed the Court to the Restatement (Third) of Torts § 27. *See* July 2, 2025 Hearing Tr. at 114:10-20. Citing the Restatement, counsel asserted that the standard is not but-for causation, as SoClean contends, but is whether the SoClean device was a substantial contributing factor in causing the degradation. (*Id*. at 115:13). In response to Judge Conti's observation that the SoClean devices would not be an equal cause of the degradation, counsel responded that the causes would not be "necessarily equal" and Philips' requested damages reflects this because Philips only seeks approximately six percent of its overall recall costs. (*Id*. at 115:5-12). Counsel argued that Philips can recover from SoClean even if SoClean was not the sole cause of the recall and "even if they weren't the equal cause of the recall." (*Id*. at 115:17-22).

Restatement (Third) of Torts § 27 provides that "[i]f multiple acts occur, each of which . . . would have been a factual cause of the physical harm at the same time

in the absence of other act(s), each act is regarded as a factual cause of the harm." Restatement (Third) of Torts § 27. Comment a provides that the Section applies "whenever there are two or more competing causes, *each of which* is sufficient without the other to cause the harm." *Id*. at Comment a (emphasis added).[8] Comment f of § 27 provides additional guidance regarding the arguments here. Comment f notes that "[i]n some cases, tortious conduct by one actor is insufficient, even with other background causes, to cause the plaintiff's harm. Nevertheless, when combined with conduct by the other persons, the conduct overdetermines the harm, i.e. is more than sufficient to cause the harm." (*Id*.). Comment f goes on to provide that " the fact that the other person's conduct is sufficient to cause the harm does not prevent the actor's conduct from being a factual cause of harm pursuant to [§ 27], if the actor's conduct is necessary to at least one causal set." (*Id*.).

"Except in trials where liability is admitted and the only issue is the amount of damages, experts testifying to damages must make assumptions about liability and the parties' legal theories in order to calculate damages." *Mahaska Bottling Co., Inc. v. PepsiCo, Inc*., 441 F. Supp. 3d 745, 758 (S.D. Iowa 2019); *In re Subozone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litigation*, 421 F. Supp. 3d 12, 36-38 (E.D. Pa. 2019) (in antitrust claim, denying motion to exclude expert

---

[8] Restatement (Third) of Torts § 26, relating to factual cause, provides a similar limitation that the factual cause must be sufficient to cause the harm, noting "Section 27 addresses the unusual case where each of the causal sets is independently capable of causing the harm and would have been a but-for cause if the other causal set had not existed." Restatement (Third) of Torts, § 26, comment c.

testimony for insufficiency of antitrust theory and noting "*Daubert* does not require a plaintiff to prove causation of damages 'twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable' and fit the facts of the case.") (further citations omitted). To determine the reliability and fit of Dr. Garibotti's opinion, the opinion must both rely on reasonable methodology and be helpful to the jury that will be ultimately tasked with resolving this matter. Reliability does not require that the opinion have "the best foundation" or even be "supported by the best methodology or unassailable research" but merely must be supported by "good grounds." *Cohen*, 125 F.4th at 462 (citing *UGI Sunbury LLC*, 949 F.3d at 832).

Dr. Garibotti's opinion as to the Recall Costs allocable to SoClean is supported by "good grounds." In essence, Dr. Garibotti calculates the total cost of the recall on a world-wide basis. (ECF No. 954-2 at ¶¶ 76-82). Dr. Garibotti then calculates the portion of these costs attributable to devices in the United States exposed to SoClean's devices. (*Id*. at ¶¶ 83-97). Dr. Garibotti then converts this calculation to USD to calculate the costs related to the recall in the United States. (*Id*. at ¶ 98). Up to this point, while SoClean may disagree with Dr. Garibotti's conclusions, Dr. Garibotti's opinion relies on good grounds through citation to financial documents and deductions that are tailored to this case. Dr. Garibotti's

reliance on the Hawkins Phase 1 study on acceleration of degradation is also permissible, as experts are permitted to rely on other sources of evidence outside of their expertise so long as their expert opinion remains within their field of expertise. *See TAKTL, LLC*, 2024 WL 4343499, at *8 (noting "'it is well-settled that one expert may rely upon another expert's opinion in formulating his own'" and declining to exclude expert testimony because while the opinion "was premised on another expert's opinion, they are appropriately limited to his own area of expertise") (further citations omitted).

Dr. Garibotti relies on her estimate of the number of CPAP devices used with SoClean's ozone-based device. (ECF No. 954-2 at ¶ 41). In assessing the number of CPAP devices used with ozone, Dr. Garibotti relies on registration data from the recall of CPAP devices and includes both "yes" responses as well as a prorated portion of the "unknown" responses as instances of ozone use. (*Id*.). As use or non-use of ozone is a binary question, it was rational for Dr. Garibotti to use the ratio of affirmative responses to total affirmative and negative responses to estimate the number of those who gave the equivocal response of unknown or don't know that should be treated as affirmative responses. Dr. Garibotti subsequently testified that this method was "a very standard approach." (ECF No. 986-4 at 124:23-24).

Next, Dr. Garibotti uses her calculation of the number of registered devices for the recall to determine the percentage of the total devices that recalled devices in

the United States comprised. (ECF No. 954-2 at ¶ 100). Dr. Garibotti calculates that recalled devices in the United States exposed to SoClean's ozone-based devices are 8.4% of the total number of recalled devices. (*Id.*). Dr. Garibotti then multiplies the 8.4% by her estimate of the total cost of the recall and estimates that $127.7 million are associated with Philips CPAP machines that used a SoClean device in the United States. (*Id.* at ¶ 101). Dr. Garibotti's opinion provides the portion of recall costs associated with CPAPs in the United States that were potentially exposed to SoClean devices. Providing this calculation to the jury would help the jury to understand the amount of the recall costs properly allocable to SoClean if it were ultimately found liable.

### B. Dr. Garibotti's Opinions Relying on Third-Party Assessments

In her rebuttal opinion, Dr. Garibotti relies on the third-party Bay Valuation Advisors' ("BVA") valuation of SoClean to analyze SoClean's damages if it prevails on its counterclaims against Philips. (ECF No. 954-3 at ¶ 97, n. 153). Because Dr. Garibotti relies on BVA's valuation without performing her own analysis, SoClean contends that Dr. Garibotti's opinion is unreliable. (ECF No. 954 at 12) (citing *Bruno v. Bozuto's Inc.*, 311 F.R.D. 124, 137-38 (M.D. Pa. 2015)).

SoClean's challenge to Dr. Garibotti's reliance on BVA's valuation appears two-fold. First, SoClean alleges that Dr. Garibotti cannot regurgitate  BVA's valuations having not completed her own valuation analysis. (ECF No. 954 at 12).

Second, SoClean contends that Dr. Garibotti's adoption of BVA's Weighted Average Cost of Capital ("WACC") to calculate "Lost Incremental Operating Profits" takes BVA's WACC calculation out of context and artificially deflates SoClean's future cash flows to arrive at a an artificially low damages opinion. (*Id.* at 13). SoClean contends that Dr. Garibotti's reliance on BVA's valuation and WACC without investigating the valuation or conducting her own analysis renders her opinion unreliable. (*Id.* at 14) (citing *ZF Meritor*, 696 F.3d at 292 and *Paoli II*, 35 F.3d at 749, n. 18).

In response, Philips again contends that experts routinely rely on third-party valuations and this is an area for cross-examination. (ECF No. 986 at 12, n.11) (citing *Allscripts Healthcare v. Andor Health*, 2022 WL 3021560, at *17-18 (D. Del. 2022) and *Insight Equity v. Transitions Optical*, 252 F. Supp. 3d 382, 296 (D. Del. 2017)). Philips emphasizes that Dr. Garibotti cited the BVA assessment in responding to Dr. Bell's opinions and that Dr. Garibotti was permitted to challenge Dr. Bell's report without corroborating its underlying data. (*Id.*) (citing *Compl. Of Borghese Lane, LLC*, 2023 WL 3114851, at *3 (W.D. Pa. 2023)). Philips also challenges SoClean's assertion that Dr. Garibotti failed to demonstrate why BVA's determination of SoClean's WACC was reliable by citing to separate portions of Dr. Garibotti's deposition transcript where Dr. Garibotti describes her review of the BVA WACC. (*Id.*).

25

Dr. Garibotti's reliance falls into two categories: reliance on the BVA valuation to highlight alleged deficiencies in Dr. Bell's report and reliance on the BVA valuation as support for her own determination of total damages, including prejudgment interest, in her rebuttal report. As to the first category, Dr. Garibotti relies on the BVA valuation to highlight other elements that she contends Dr. Bell did not address, including not taking into account "pre-existing trends or test whether the forecast revision between March and December 2021 reflected a continuation of these broader challenges" and that Dr. Bell "does not acknowledge this decline [in SoClean's cash flow] or adjust the March forecast to reflect that the company's value had already fallen." (ECF No. 954-3 at ¶ 110-111). Dr. Garibotti thus uses the BVA valuation to address alleged deficiencies in Dr. Bell's analysis, which is permissible. *See e.g. Compl. Of Borghese Lane, LLC*, 2023 WL 3114851, at *3 ("[c]ourts have held that '[i]t is the proper role of rebuttal experts to critique [an] expert's methodologies and point out potential flaws in the experts' reports'") (further citation omitted).

As to her use of the BVA WACC for SoClean, Dr. Garibotti noted that she corrects Dr. Bell's methodology for calculating damages by correcting the WACC to "one that more appropriately reflects SoClean's risk profile" and applies "the 21 percent WACC from the BVA March 2021 valuation." (ECF No. 954-3 at ¶ 143).

Whether this is an appropriate WACC for SoClean can be tested at trial, but it was appropriate for Dr. Garibotti to use the WACC selected by SoClean's own expert.

## C. Dr. Garibotti's Rebuttal Opinion and Supplemental Exhibits

Finally, SoClean challenges both Dr. Garibotti's opinions on prejudgment interest in her rebuttal report and supplemental exhibits served on May 17, 2025 as untimely and improper. (ECF No. 954 at 14). As to Dr. Garibotti's opinions on prejudgment interest, SoClean contends that Dr. Garibotti offered a methodology and calculation for prejudgment interest on Philips' affirmative claims for the first time in her rebuttal report. (*Id*.). SoClean contends that this opinion is not in rebuttal to Dr. Bell's opinions because Dr. Bell addressed only SoClean's affirmative claims in his opening report and did not address Philips' affirmative claims. (*Id*.).

As to the supplemental exhibits, SoClean contends that, contrary to Philips' representation that the exhibits are in response to information Dr. Bell provided in his rebuttal report, Dr. Bell provided no new information or financial data in his report that would require supplemental exhibits. (ECF No. 954 at 14-15). SoClean contends that Dr. Garibotti recognized that the information in the supplemental exhibits was available to her before the close of expert discovery and thus the supplemental exhibits should be struck as untimely. (*Id*. at 15). During the July 2 hearing, Judge Conti permitted SoClean to recall Dr. Garibotti for deposition limited to one hour to address the supplemental exhibits. *See* July 2 Hearing Tr. at 124:13-

14. Accordingly, the issue of any alleged prejudice stemming from the Supplemental Exhibits is not before the Court at this time.

As to the issue of prejudgment interest, Philips responds that neither party needed to submit an expert opinion on prejudgment interest because the issue goes to the Court. (ECF No. 986 at 13).[9] But because Dr. Bell provided an opinion regarding prejudgment interest in his expert report, Philips contends that Dr. Garibotti properly applied prejudgment interest to her original damages analysis in her rebuttal report in response to Dr. Bell's report. (*Id*.). As prejudgment interest is an arithmetic calculation to be made by the Court and not requiring expert witness input, SoClean's attack on Dr. Garibotti's prejudgment interest calculation will be rejected.

As to Dr. Garibotti's rebuttal report on disgorgement, SoClean's challenge ignores the burden shifting framework for disgorgement of profits under the Lanham Act. (ECF No. 986 at 13-14). Under the burden shifting framework of the Lanham Act, a plaintiff bears the burden to establish only the infringer's revenue before the burden shifts to the infringer to prove any deductions or costs. (ECF No. 986 at 13) (citing *Am. Eagle Outfitters v. Walmart*, 2023 WL 1778786, at *3 (W.D. Pa. 2023)). Philips contends Dr. Garibotti initially did just this, calculating SoClean's alleged

---

[9] Philips cites *In re Physiotherapy Holdings*, 2019 WL 3916536, at *3 (D. Del. 2019), *Mckenna v. City of Phila.*, 2009 WL 2230771, at *3 (E.D. Pa. 2009), *Vitamin Energy v. Evanston Ins.*, 2023 WL 7101188, at *6, n. 7 (E.D. Pa. 2003) and *Dennis v. City of Phila.*, 2024 WL 4008747, at *7 n. 10 (E.D. Pa. 2024), in support of this argument. (ECF No. 986 at 13).

revenues as $189.1 million. (*Id*. at 14). In her rebuttal, Dr. Garibotti then used Dr. Bell's cost calculation to calculate SoClean's ill-gotten profits. (*Id*.). Philips contends that this is the intended process and that SoClean's questioning of whether Dr. Garibotti could have made this calculation in her affirmative report ignores the burden-shifting framework. (*Id*.).

The Lanham Act recognizes that in claims under section 1125(a), as Philips asserts here, "[i]n assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction." 15 U.S.C.A. § 1117(a). The Third Circuit has noted, in assessing a claim for trademark infringement subject to the same provision, that a plaintiff in a trademark claim is "tasked with proving the infringer's sales before the burden of proof shifts to the defendant to show costs and deductions." *Covertech Fabricating, Inc. v. TVM Building Products, Inc.*, 855 F.3d 163, 177 (3d Cir. 2017). District courts in the Third Circuit have adopted a literal interpretation of the burden shifting framework. *See Penn Engineering & Manufacturing Corp. v. Peninsula Components, Inc*., 2025 WL 2178414, at *1 (E.D. Pa. July 31, 2025) (noting "[d]istrict courts have also applied the statute's burden-shifting framework in literal fashion" and advising that the proximate cause inquiry for whether defendant's sales are the result of a Lanham Act violation should be folded into the deductions portion of framework); *see also American Bridal & Prom Indus. Assoc., Inc. v. 2016dressforprom.com*, 2017 WL

4154934, at *5 (D.N.J. Sept. 19, 2017) (noting that burden shifting framework under the Lanham Act requires "the plaintiff to first prove defendant's sales, and then the defendant to prove any costs or deductions he alleges."). In light of this burden-shifting framework, Dr. Garibotti required Dr. Bell's cost analysis before she could calculate SoClean's profits. There was nothing improper in Philips proceeding in the manner in which it has.

## VI.    CONCLUSION

Philips sustained its burden of showing that Dr. Garibotti's opinions are admissible. Thus, it is recommended that SoClean's Motion be denied.

Dated: September 15, 2025                 */s/ Thomas I. Vanaskie*
                                          Hon. Thomas I. Vanaskie (Ret.)
                                          Special Master

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: SOCLEAN, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Master Docket: No. 22-MC-00152-JFC |
| | MDL No. 3021 |
| This Document Relates to: | |
| *SoClean, Inc. v. Koninklikje Philips N.V., et al.,* 2:22-cv-542 | |

## RECOMMENDATION ON SOCLEAN'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DR. MARIA E. GARIBOTTI

For the reasons provided in the attached Report, it is hereby recommended

that SoClean's Motion to Exclude the Opinions and Testimony of Dr. Maria E.

Garibotti (ECF No. 953) be denied.


Dated: September 15, 2025               */s/ Thomas I. Vanaskie*
                                         Hon. Thomas I. Vanaskie (Ret.)
                                         Special Master